CULEBRAS ENTERPRISES CORP., et al., Plaintiffs, Appellants,

v.

Miguel A. RIVERA RIOS, et al., Defendants, Appellees.

Nos. 85–1924, 86–1011.

United States Court of Appeals, First Circuit.

Argued Sept. 5, 1986.

Decided March 11, 1987.

Edward M. Borges, Hato Rey, P.R., with whom O'Neill & Borges, Jaime Sifre Rodriguez and Cepeda, Sanchez-Betances & Sifre, Hato Rey, P.R., were on brief, for plaintiffs, appellants.

Isabel Pico-Vidal, Asst. Sol. Gen., with whom Rafael Ortiz Carrion, Sol. Gen., and Reina Colon De Rodriguez, Acting Deputy Sol. Gen., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and WOLF,[*] District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This appeal is from the district court's denial of damages in an action brought under 42 U.S.C. § 1983 (1982) by corporate real estate developers against present and former members of the Puerto Rico Planning Board; against the Culebra Conservation and Development Authority; and against the members of that Authority, who include the Mayor of the Municipality of Culebra, the Secretary of the Puerto Rico Department of Natural Resources, and others.

In their section 1983 action, plaintiffs allege that undeveloped real estate they purchased on the island of Culebra, which they had subdivided into five cuerda (4.86

---

[*] Of the District of Massachusetts, sitting by designation.

acres) lots and then proposed to sell as residential properties, was "frozen" in 1975, after they purchased it, by new, unreasonably restrictive zoning regulations promulgated by the defendant Puerto Rico Planning Board. The "freeze" continued until 1984 when, four days before the present case was due to be tried to a jury, the parties stipulated to a partial settlement which allowed plaintiffs to sell their land in lots of five cuerdas as they had earlier proposed. This partial settlement had the effect of mooting their injunctive prayers, but expressly did not affect plaintiffs' claim for damages to compensate them for their inability to make economic use of their property during the nine years that it was subject to the allegedly illegal zoning requirements. The district court accordingly addressed the damages claim. Ruling on the basis of the pleadings and discovery materials before it, the court concluded, as a matter of law, that plaintiffs were not entitled to recover damages. Plaintiffs now appeal from that determination. We affirm.

I.

The island of Culebra, located several miles off the eastern coast of the island of Puerto Rico, is a part of the Commonwealth of Puerto Rico. In 1973 Culebra had about 1,000 inhabitants. Until the mid–70s it was used by the United States Navy for military exercises including gunnery practice; in 1971, such exercises became limited by agreement to the northwest side of the island, and in 1973 the United States Secretary of Defense announced that by July 1, 1975 all naval operations at Culebra would cease. Recognizing the developmental pressures that would result when the Navy left, the United States Secretary of the Interior and the Governor of Puerto Rico issued a joint report on October 29, 1973 containing a timetable for the conveyance of federally owned land on Culebra to the Commonwealth of Puerto Rico, together with assurances by the Governor to the Secretary of the Interior,

that the Commonwealth's concern for the ecological integrity of Culebra will be manifested by strong legislative and executive action to safeguard the environment in the interim.

The report recommended the creation of the defendant Culebra Conservation and Development Authority, whose mission would be to share with the United States Department of the Interior the supervision of the management and conservation of Culebra's "unique natural resources."

Perhaps foreseeing the Navy's departure, plaintiff corporations, beginning in 1966, purchased various geographically contiguous plots of land on Culebra. By 1970 they had assembled a parcel some 406 cuerdas in size (a cuerda is 0.97 acre). This land was undeveloped property; it bordered Puerto del Manglar, a bioluminescent bay forming a natural harbor on the southeastern side of the island. In the late 1960s plaintiffs obtained from the Planning Board permission to build a very high intensity development which, for reasons not apparent, plaintiffs never thereafter proceeded to construct. Then, in 1973 and 1974, plaintiffs took steps to lay out their property in five cuerda lots, intending to sell the lots to persons who would build their own residences thereon. To effect the subdivision, plaintiffs spent around $35,000 for surveying, erecting monuments, constructing roads, etc. A regulation of the Puerto Rico Planning Board then in effect, Art. 3 of Planning Regulation No. 3, adopted January 26, 1949, and applicable throughout Puerto Rico,[1] exempted from subdivision regulation "in the rural zone for agricultural purposes" lots of five cuerdas or more. Plaintiffs contend that this exemption meant that they were

---

1. The Puerto Rico Planning Board was created by the legislature of the Commonwealth of Puerto Rico in 1942. In 1975, just before it adopted the Culebra zoning regulations which plaintiffs challenge, its statutory powers were enlarged to those currently held. P.R. Laws Ann. tit. 23, §§ 62 *et seq.* (1983). These include promulgation of zoning and subdivision regulations for all of Puerto Rico, preparing land use plans, and ruling on land use matters. The Board has extensive discretionary powers, including the power in "special cases" to deny projects where the applicable regulations are deemed "impracticable."

free to sell off their property in lots of this size without Planning Board approval. In their arguments, defendants have equivocated on whether or not this was so. They seem now to argue that the Art. 3 exemption did *not* apply, as plaintiffs' proposed "second home" use was non-agricultural. In any case, both sides agree that the property was not subject to zoning restrictions, as such, in 1973 and 1974.

The regulatory picture changed radically for the worse, from plaintiffs' viewpoint, late in 1974 and in 1975. Implementing plans to regulate development in Culebra that were first announced on May 15, 1971, the Planning Board in 1975 issued a special land use plan for Culebra, together with a zoning map and regulations. The declared purpose of these was to conserve and protect from deterioration Culebra's "valuable natural resources." All land on the island was divided and classified into zoning districts. Of the 406 cuerdas belonging to plaintiffs, around 60 percent was classified "P," which is a form of zoning that prevents property from being used other than for public use purposes.[2] Virtually all of the remaining property was zoned "RO–25–C," a classification unlike any found elsewhere in Puerto Rico, which limited lots to 25 cuerdas or greater, and also restricted uses to agriculture and small tourist hotels.

Faced with the new land use and zoning provisions, plaintiffs were unable to proceed with their plan to sell off their land in five cuerda lots. In 1977, plaintiffs requested from the Planning Board a so-called location and land use consultation, to enable them to sell in five cuerda parcels.

This request was denied early in 1978 because of non-compliance with the population density requirements of the land use plan for Culebra. A letter from plaintiffs' counsel requesting reconsideration was denied later in 1978. Plaintiffs brought this suit in 1979.

Thereafter, in 1983, the Planning Board rezoned the parts of plaintiffs' property that had been zoned "P" (substantially all of plaintiffs' land) to "RO–25–C" (which limited development to 25 cuerdas, agricultural lots, *supra*). A year later, on the eve of the trial of this case, a partial settlement stipulation was entered into and approved by the district court which allowed plaintiffs to sell off their lots in five cuerda sizes as they had originally desired, notwithstanding the RO–25–C zoning. Plaintiffs reserved their right to claim damages for the period of time that, allegedly, they were deprived of the use of their property, together with attorneys' fees. The district court subsequently ruled, as a matter of law, that damages could not be obtained; however, it awarded plaintiffs their attorneys' fees on the ground that they were the prevailing party. In this appeal plaintiffs challenge the denial of their damages claim.

II.

Were it not for three recent Supreme Court opinions discussed below, it would be an easy matter, based on this circuit's precedents, to dispose of this appeal.

In *Pamel Corp. v. Puerto Rico Highway Authority*, 621 F.2d 33 (1st Cir.1980), we held that a *federal court* could not award

---

2. Under "P" zoning, uses are limited to public park, public parking space, public education institution, public housing project, government offices, public hospital, fire and police stations, public airport, public cemetery, and other public uses. Defendants state in their brief that the particular object of "P" zoning in Culebra was to establish controls for conservation and preservation of natural resources. One such controlled area was the "Puerto del Manglar Watershed Area," which apparently included some of plaintiffs' "P" zoned land. Support for defendants' explanation is found in a document entitled "Culebra Zoning Project." The constitutionality of "P" zoning has been challenged both in the courts of this circuit and Puerto Rico. *See,*

*e.g., Urbanizadora Versalles, Inc. v. Rivera Rios,* 701 F.2d 993 (1st Cir.1983) (declaring 14–year freeze unconstitutional); *Heftler International, Inc. v. Planning Board,* 99 P.R.R. 454 (1970) (constitutional issue not reached). In 1979, the legislature of Puerto Rico limited the permissible duration of "P" zoning to eight years. Defendants state in their brief that the Planning Board rezoned all of plaintiffs' property zoned "P" to "RO–25–C" in 1983 in recognition of the eight-year period. Rezoning of plaintiffs' land to "RO–25–C" was followed by the partial settlement stipulation which allowed plaintiffs to sell off lots of five cuerdas notwithstanding the 25 cuerda limits of the "RO–25–C" classification.

damages in a case such as the present. Pamel had complained that when the Puerto Rico Highway Authority reclassified Pamel's two parcels of land as "P" (the same public use classification in issue here), it unconstitutionally deprived Pamel of the land's entire value. We acknowledged that,

> Regulation of property use may be so oppressive or arbitrary that it crosses the wavering line separating a valid exercise of the police power from an exercise of the eminent domain power, which would be invalid without payment of the just compensation mandated by the due process clauses of the Fifth and Fourteenth Amendments.

621 F.2d at 35.

Nonetheless, citing what we believed to be the weight of authority, we also declared,

> The remedy awarded in such cases, however, has not been the awarding of the value of the diminished property right, but a declaration of the invalidity of the purported exercise of the police power.... [C]onfusion about this issue has been sown by loose language about excessive land use regulation effectuating a "taking." A zoning regulation that exceeds the permissible bounds of the police power does not in reality confiscate the property, but regulates with excessive or arbitrary severeity.... A court does not declare that an offensive zoning regulation has taken the property, but that the government cannot impose the restriction without formally paying [*i.e.*, where it has not paid] for it.

621 F.2d at 35–36. In *Pamel*, therefore, we reversed the district court's ruling that—but for the bar of the eleventh amendment—plaintiff could recover damages for the lost value of its property during the period of the oppressive regulation. Instead of reaching the eleventh amendment question, we held that there was no damages remedy in any event in a federal court.

Two years later, in *Citadel Corp. v. Puerto Rico Highway Authority*, 695 F.2d 31 (1982), we reaffirmed *Pamel*. Writing for the panel, Judge Coffin said,

> Federal courts may enjoin such unconstitutional conduct on the part of states [*i.e.*, a state's enactment of a land use regulation which, because it exceeds the state's police powers, unconstitutionally "takes" a resident's land] in an inverse condemnation proceeding, *but they may not award damages*.

695 F.2d at 34 (emphasis supplied).

By the time we decided *Citadel*, the Supreme Court had come down with the first of its three recent opinions raising but not deciding this issue, to wit, *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981). In *San Diego Gas*, a bare majority of the Court dismissed the appeal for lack of a final judgment. However, four of the justices, dissenting from the dismissal, would have reached the merits and would have ruled that the State of California was constitutionally required to provide a damages remedy for an owner whose land was "taken" by a land use regulation that exceeded the state's police powers.

The panel of our circuit that decided *Citadel* did not think that *San Diego Gas* required us to overturn *Pamel*. The panel acknowledged language in Justice Rehnquist's concurrence in *San Diego Gas* that might be taken to portend a fifth vote for the dissenting view, but declined to engage in "judicial tea leaf reading." 695 F.2d at 34 n. 4.[3] We stated,

> In any event, none of the Justices [in *San Diego Gas*] addressed the issue of federal court ordered compensation, since the lower court in *San Diego Gas* was a state court. *Even if the Constitution is read to require compensation in an inverse condemnation case, the Eleventh Amendment should prevent a federal court from awarding it.*

695 F.2d at 34 n. 4 (emphasis supplied). Since *Citadel* we have followed the teachings in *Pamel* and *Citadel*. *See Urbaniza-*

---

**3.** "Judicial tea leaf reading" is today further complicated by the fact that Chief Justice Burg- er and Justice Stewart, who participated in *San Diego Gas,* are no longer on the Court.

dora Versalles, Inc. v. Rivera Rios, 701 F.2d 993 (1st Cir.1983) (granting injunctive relief against a 14–year freezing of property caused by "P" zoning and other regulation); Alton Land Trust v. Town of Alton, 745 F.2d 730, 733 (1st Cir.1984) ("Damages are not available in federal proceedings for excessive state land use regulation."); Ortiz de Arroyo v. Barcelo, 765 F.2d 275, 280 (1st Cir.1985) (where a government has deprived plaintiff of his property without due process of law, a federal court "may not award the value of the diminished property right; it may issue only declaratory or injunctive relief").

Meanwhile, hard on the heels of San Diego Gas, the Supreme Court has twice more considered, but still not decided, the vexing question of whether damages are mandated if excessive state and local land use regulations cause a "taking" without just compensation.[4] The first of the Court's most recent forays was Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In Williamson the developer of a residential subdivision sued a local planning commission in the federal district court, alleging that the commission's application to it of zoning laws and land use regulations amounted to a taking without just compensation in violation of the fifth and fourteenth amendments. The jury found that the developer had been denied the economically viable use of his property contrary to the just compensation clause of the fifth amendment, and awarded damages for a partial taking. The district court revoked the damages, but enjoined the commission from further action of the type challenged, ruling that the temporary deprivation of economic benefit could not, as a matter of law, constitute a taking. The Sixth Circuit reinstated the damages verdict, essentially for reasons stated by the dissenters in San Diego Gas.

The Supreme Court reversed and remanded the judgment of the Sixth Circuit, holding that the developer's money damages claim was premature. If considered as a claim under the just compensation clause, the claim was premature because the developer had neither exhausted the commission's variance procedures nor sought compensation through the state's inverse condemnation procedures—which had been interpreted by the state courts to allow recovery where a "taking" is effected by restrictive zoning laws. 105 S.Ct. at 3116–22. If viewed strictly as a due process claim, the money damages claim was

4. In point of fact, the precise question is somewhat narrower. The question is whether a landowner, after he has secured a judicial ruling that a land use regulation "goes too far"—facially or as applied by a local agency—is entitled to recoup damages for the period that he was subjected to excessive regulation, on the theory that there was a "partial taking"—i.e., "partial" because its duration ended when the court declared the regulation or the agency's action to be illegal or it was withdrawn.

The question poses, among other problems, a policy issue bearing upon land use and conservation planning. If landowners who succeed in overturning the refusal of local authorities to permit development can recover damages, this could be a significant disincentive to legislators and planning and zoning agencies when considering whether or not to risk regulating private development. It will be very difficult to confine such a damages action to exceptional cases. In many, perhaps most, situations where a planning or zoning board denies a permit or refuses a variance, the owner will later argue, should he succeed in overturning the agency before a judicial tribunal, that the result of the agency's denial was to deny him the economic use of his

land and effect a "taking" during the interim. See Alton Land Trust v. Town of Alton, 745 F.2d 730 (1st Cir.1984). See also Chongris v. Board of Appeals, 811 F.2d 36 (1st Cir.1987). As Justice Stevens pointed out in his perceptive Williamson concurrence, the question boils down to whether to reimburse the temporary harm which befalls a landowner while he litigates a particular land use regulation. 105 S.Ct. at 3125. If one considers the almost byzantine intricacy of deciding when a victorious landowner has suffered a "taking," and the intricacy of the interplay between state and federal tribunals, one might wonder—as did Justice Stevens in his Williamson concurrence—whether damages should be in order for the temporary harms that are the by-products of governmental decisionmaking. As this court has said, "[a]n unfortunate but unavoidable aspect of all litigation, federal as well as state, is that it takes times and money." Roy v. City of Augusta, 712 F.2d 1517, 1523 (1st Cir.1983). In any event, escalating legal complexity, and negative effects on local land use planning, seem the inescapable results of any broad rule mandating damages in these cases.

likewise premature, because the amount of damages could not be estimated where the developer had failed to apply for variances from the challenged regulations. 105 S.Ct. at 3122–24.

The Court's latest opinion in this area was in 1986, in *MacDonald, Sommer & Frates v. Yolo County*, —— U.S. ——, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986). In that case, planning regulations were challenged as a "taking" and damages sought. Again, the Court did not reach the question of whether damages were proper, since the absence of a final decision of the county planning commission left the Court unable to determine if a "taking" had occurred. A dissenting opinion by Justice White, in which Justices Rehnquist and Powell joined in part, again indicates, as in *San Diego Gas*, that some of the justices want to compensate an owner for the period during which an excessive regulation is in place, on the theory of a "partial taking." At the same time, the Court's insistence that local administrative proceedings be complete, as well as Justices Rehnquist's and Powell's refusal to go all the way with Justice White's analysis, underscores the Court's awareness of the extraordinary delicacy of the problem. *See* note 5, *supra*. *See also* Justice Stevens's concurrence in *Williamson*, 105 S.Ct. at 3125.[5]

All this leads us to two conclusions here:

■ 1. Whether, and in what respects, and in what tribunals, damages should be available for the period until an excessive regulation is enjoined or withdrawn, remains unclear at the highest level. Our holdings in *Citadel* and *Pamel* that a federal court should not award damages but should limit itself to injunctive relief against land use regulations that "go too far" have not been overturned; yet it appears that some of the justices may believe that a damages remedy is required in some cases. Judge Coffin's observation in note 4 of *Citadel* nonetheless remains true: even if it should be held that state courts must

grant damages, it is less than clear that a federal damages remedy is available and, even if so, in what circumstances. *See infra*. Until a clearer signal is received from the Supreme Court, we think it appropriate to continue to follow *Citadel* and *Pamel*.

2. While under the doctrine of *stare decisis*, therefore, our precedents in *Pamel* and *Citadel* put an end to appellants' damages claim, we hesitate to stop there lest we give the impression that, but for those cases, appellants would have a compelling damages claim. In fact, there are significant other reasons why their claim does not succeed. One, in particular—appellants' failure to have concluded their pending action in the Puerto Rico courts seeking inverse condemnation damages under Puerto Rico law—disposes of this appeal even were the Supreme Court ultimately to differ with our decisions in *Pamel* and *Citadel*. Additionally, the eleventh amendment and the absolute and qualified immunities available to individual defendants are barriers to relief here. We turn now to these other matters.

### III.

A principal reason the Supreme Court in *Williamson* reversed the Sixth Circuit's allowance of damages to the developer was that he was premature to have sought damages for the alleged "taking" of his property before making use of Tennessee's inverse condemnation procedure. 105 S.Ct. at 3121–22. The matter was explained as follows by Justice Blackmun, writing for the Court,

A second reason the taking claim is not yet ripe is that respondent did not seek compensation through the procedures the State has provided for doing so.... The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.... Nor does the Fifth Amendment require that just compensation be paid in advance of, or

5. We note that the Court may further address this issue in the pending case argued on January 14, 1987 of *First English Evangelical Church of Glendale v. County of Los Angeles*, No. 85–1199,

55 U.S.L.W. 3534 (Feb. 10, 1987) (case pending before the Supreme Court on appeal from the California Court of Appeals, 2d District).

contemporaneously with, the taking; all that is required is that a "reasonable, certain and adequate provision for obtaining compensation" exist at the time of the taking.

105 S.Ct. at 3121.

The Court went on to analogize to *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), its holding that a property owner has not suffered a violation of the just compensation clause until after the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the state.

■ Decisions of the Supreme Court of Puerto Rico indicate that that court will entertain an inverse condemnation action for damages when it believes that property is "taken" by unconstitutionally excessive governmental regulations. While there is no Puerto Rico statute providing expressly for an inverse condemnation remedy, and, more troubling, there is as yet no case where such damages were actually awarded, discussions in several opinions of Puerto Rico's high court indicate acceptance of an inverse condemnation remedy.

The Puerto Rico court first mentioned inverse condemnation in *Heftler International, Inc. v. Planning Board*, 99 P.R.R. 454, 460 (1970), a case involving a challenge to "P" zoning.[6] The Puerto Rico Court said that the purpose of an inverse condemnation action is "to serve as a protection for the owners to force the State to comply with the constitutional provisions guaranteeing that no person shall be deprived of his property without due process of law and without having received compensation." Because plaintiff in *Heftler* had not exhausted administrative remedies, the court did not decide whether the Puerto Rico superior court should have entertained an inverse condemnation action.

6. In *Heftler* the court described "P" zoning in these words:
A classification "P" constitutes almost a total freezing. The owner cannot use it during the time it is classified thus. It merely has the appearance of a condemnation although without compensation. It seems that the police

In *Commonwealth v. Northeastern Construction Co.*, 103 D.P.R. 377, 383–84 (1975), a condemnation action brought by the government, the court said the following by way of explanation of a "de facto taking":

It is precisely for these extraordinary cases of physical seizure or taking of a real right without previous deposit of a just compensation that the action for inverse condemnation has been established.... It is called inverse because it is brought by the owner of the property against the State to obtain the compensation to which he is entitled but the courts generally apply the same rules and principles which govern the action for condemnation instituted by the State.... The existence of the public use and the just compensation are litigated thereon in the same form and manner that these matters are elucidated in the action for condemnation of private property.

(Citations omitted.)

In *Planta de Cal Icaco v. Superior Court*, 103 D.P.R. 385, 388 (1975), the government intitiated a condemnation proceeding. The court said that there is no harm in allowing the government to take possession of the private property without depositing the estimated value of compensation, because the owner of property which has been taken could exercise the inverse action for condemnation in protection of his right to compensation, immediately after the material taking has occurred.

The most recent material decision of the Puerto Rico Supreme Court is in *Sucesion Garcia v. Autoridad de Carreteras*, 114 D.P.R. 676 (1983). There, the Highway Authority "froze" plaintiff's property by regulation pursuant to longterm plans to seize it for a proposed highway. Plaintiff brought suit in the Commonwealth courts demanding the immediate condemnation of

power of the State is fused with that of condemnation. It is urgent that the corresponding authorities pay attention to these inequities in the system of classification of land in force for the purpose of correcting them for the benefit of a sound public administration. 99 P.R.R. at 461.

the property with just compensation or, in lieu, the lifting of the restrictions, with damages for the unreasonable freezing. In its opinion, the Supreme Court of Puerto Rico noted that it had previously given the agency a period of time to show cause why the court should not order it to expropriate one of the parcels, and to unfreeze and grant damages with respect to the other parcel. The court further noted that shortly after issuance of the show cause order, the agency had indeed condemned the first parcel, paying damages therefor, and had released the other. The court, therefore, saw no need to grant relief, other than to strike down a condition on the release of the second parcel. The tenor of its opinion suggests, however, that the Puerto Rico court took for granted its authority, in a proper case, to force the government to effect a compensated "taking" where property was unreasonably regulated.

While we gather from the above that the Supreme Court of Puerto Rico recognizes the general availability of an inverse condemnation remedy in cases such as this, we cannot tell whether the Puerto Rico court would regard the "P" zoning here in issue, which lasted for nine years, as of such unreasonable duration as to constitute a compensable taking. Puerto Rico now has a statute allowing public use zoning for a period not exceeding eight years.[7] Appellants, however, do not dispute the existence of a local inverse condemnation remedy, whatever its ultimate utility on the present facts. Counsel for appellees informed the court at oral argument that appellants had on May 30, 1986 filed an inverse condemnation action in a Puerto Rico court.

■ Appellants object to the adequacy of the remedy under Puerto Rico law on the ground that, by statute, if they obtain a judgment in a Puerto Rico court against the Commonwealth of Puerto Rico, they cannot also recover from the individual officials, and vice versa. P.R.Laws Ann. tit. 32 § 3083 (1985). We do not understand, however, why this election as to whom to recover from, which the local statute requires, makes the remedy inadequate. Damages would be recoverable in any event. In *Parratt v. Taylor,* the Court said, "Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *See also Hudson v. Palmer,* 468 U.S. 517, 535, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984). So long as just compensation is provided it would be immaterial from whom received.

A more serious objection to Puerto Rico's inverse condemnation remedy is that it has not been fully spelled out by the Supreme Court of Puerto Rico and its implications for the present situation are thus unclear. It may or may not turn out to be less "certain and adequate" than *Williamson* requires. Lack of clarity is not unusual, however, when legal rights are still in process of definition through case-by-case adjudication. The Puerto Rico high court has

---

7. On January 29, 1979, the legislature of Puerto Rico approved Act No. 2, P.R. Laws Ann. tit. 32, §§ 2921–2922, providing an outer limit of eight years as a reasonable time for subjecting property to public use zoning although with longer allowances for properties like appellants' that were already subject to "P" zoning. The constitutionality of this provision has yet to be determined. *Compare* our decision in *Urbanizadora Versalles, Inc. v. Rivera Rios,* 701 F.2d 993 (1984) (an uncompensated 14–year freeze effected by "P" zoning and other measures is constitutionally excessive by any standard). Whether public use "P" zoning exceeds the police power is a matter that has come before the Supreme Court of Puerto Rico on several occasions (besides in *Heftler, see* note 5, *supra* ). The court declared as early as 1950 that land zoned for public use must be acquired by the government by purchase or condemnation within a reasonable time. *Segarra v. Planning Board,* 71 P.R.R. 139 (1950). In *Flamboyan Gardens v. Junta de Planificacion,* 103 D.P.R. 884 (1975), the court refused to fix a specific term of years as the maximum period for the "freezing" of lands for public use purposes. The test, according to the court, involves weighing a number of specified factors and determining reasonableness. *See also The Richard Group v. Junta de Planificacion,* 108 D.P.R. 23 (1978). In *Sucesion Garcia v. Autoridad de Carreteras,* 114 D.P.R. at 679, the Puerto Rico Supreme Court indicated disapproval of a public use freeze that lasted for 14 years, although it did not address the availability of damages.

at least discussed, and has seemingly signalled, the existence of an inverse condemnation remedy. In her concurrence in *Hudson v. Palmer,* Justice O'Connor stated that in order to prevail on a damages claim for an alleged deprivation of due process or taking without just compensation, "the claimant must either avail himself of the remedies guaranteed by state law or prove that the remedies are inadequate." 468 U.S. at 539, 104 S.Ct. at 3207. Plaintiffs have certainly not proven the inadequacy of the Commonwealth's inverse condemnation remedy. We think they must pursue that remedy before they can maintain a federal damages claim, since, when fleshed out by the local court, that remedy could well provide the "certain and adequate" relief they seek. Moreover, the doctrine of abstention—in addition to the reasons given in *Williamson*—makes it appropriate to await a decision in the Puerto Rico action, since the federal constitutional issues may "be mooted or presented in a different posture by a state court determination of pertinent state law." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1975) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)).[8]

■ We hold that appellants' claim for damages for the nine years that its property was allegedly "frozen," based on the theory of a partial taking in violation of the just compensation clause of the fifth amendment, is premature. Compensation must first be sought, as appellants are doing, from the Commonwealth of Puerto Rico through an action for inverse condemnation.

We are aware that, in *Williamson,* the availability of a state inverse condemnation remedy was only held to defeat plaintiff's just compensation clause claim. To defeat the *Williamson* owner's claim that his property was taken without due process,

the Court relied on the owner's failure to have sought administrative variances before seeking damages in federal court. Here, too, appellants did not seek variances, although Planning Board regulations provide for them. Instead, appellants merely filed a written request for a location and land use consultation. When they were turned down, their attorney wrote a letter seeking reconsideration. Hence, while there are factual differences between the two cases, appellants' due process claim may fail for the same reason that the *Williamson* due process claim failed.

■ But we do not rest there. Whether or not the failure to seek variances here was conclusive, we doubt the viability of the due process claim so long as the Puerto Rico inverse compensation proceeding remains undecided. Well before this century, the Supreme Court held that the fifth amendment's command that private property shall not be taken for public use without just compensation applies to the states via the fourteenth amendment's due process guarantee. *Chicago, B & Q R. Co. v. Chicago,* 166 U.S. 226, 236, 17 S.Ct. 581, 584, 41 L.Ed. 979 (1897). In *Chicago,* the Court held that "it is not due process of law" if a state fails to provide for compensation when private property is taken for public use. *Id.* By the same token, if provision for compensation exists by means of an inverse condemnation proceeding, a "taking" effected by an excessive regulation does *not* violate the due process clause. To repeat Justice Blackmun's analysis in *Williamson:*

> The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation.... Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a "reasonable, certain and adequate provision for ob-

---

**8.** The present case differs from *Urbanizadora Versalles, Inc. v. Rivera Rios,* 701 F.2d 993, 997 (1st Cir.1983), where we rejected abstention. That case did not involve a damages claim at all, let alone one that would be obviated were the Commonwealth, in a pending inverse condemnation action, to provide just compensation.

taining compensation" exist at the time of the taking.

105 S.Ct. at 3121.

There is no claim here of a lack of adequate *procedural* due process; rather, the claim is that the "P" and "RO–25–C" zoning provisions applied to the appellants' property were *substantively* invalid because they exceeded the state's police powers and effected an uncompensated taking. If, however, the state affords a reasonable, certain and adequate procedure for obtaining compensation, there can be no violation of substantive due process. Since, as we have observed, Puerto Rico may provide such a means for obtaining compensation, we see no possible basis for separate recovery in a federal court on grounds of a denial of due process, at least until the state inverse condemnation proceeding is resolved. It would be duplicative for a federal court to assess damages on a due process theory while a Commonwealth of Puerto Rico court was in the process of awarding just compensation for the same taking. Accordingly, appellants' due process claim must fail.

## IV.

Besides the above, there are other reasons leading us to reject appellants' damages claims.

■ The eleventh amendment bars the recovery of damages in a federal court against the Commonwealth of Puerto Rico, *e.g., Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir.1983), and, by the same token, it bars the recovery of damages in *official capacity* suits brought against Puerto Rico officials where recovery will come from the public fisc. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Defendants here were sued both "individually" *and* as current or former members of the Puerto Rico Planning Board or Culebra Conservation and Development Authority. The gravamen of the complaint is that official actions by the Planning Board, zoning plaintiffs' land "P" and "RO–25–C," amounted to an uncompensated taking in violation of the just compensation and due process clauses of the fifth amendment. Insofar as defendants were sued for actions taken in their *official capacities* as members of agencies of Puerto Rico, this was "only another way of pleading an action against an entity of which an officer is an agent," *i.e.,* against, ultimately, the Commonwealth of Puerto Rico. *Kentucky v. Graham,* 105 S.Ct. at 3105 (quoting *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55). *See Ford Co. v. Department of Treasury,* 323 U.S. 459, 463–64, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1944). *See, e.g., Garcia v. Board of Education,* 777 F.2d 1403, 1407 (10th Cir.1985). The eleventh amendment precludes such actions to the extent money damages are sought.

Appellants would have us distinguish between their suing the Planning Board members and their suing the members of the Culebra Conservation and Development Authority. Even if an official capacity suit against the former is tantamount to a suit against the Commonwealth of Puerto Rico, appellants contend that a suit against the members of the Authority (in their official capacities) is not. Appellants argue that while the Planning Board is an official arm of the Commonwealth of Puerto Rico, the Authority is an autonomous agency which can sue and be sued, raise its own funds and control its own property. It is, therefore, not an "arm" of the Commonwealth, and is not entitled to eleventh amendment protection.

We disagree. We believe that the character of the Culebra Conservation and Development Authority makes it an arm of the Commonwealth of Puerto Rico, so that a damages action brought against its members, in their official capacities, is barred by the eleventh amendment.

Whether a local entity "is to be treated as an arm of the state partaking of the State Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend ... depends, at least in part, upon the nature of the entity created by state

law." *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In *Perez v. Rodriguez Bou,* 575 F.2d 21 (1st Cir. 1978), we said:

> The extent and nature of the Commonwealth of Puerto Rico's financial support for the University of Puerto Rico and the fact that the Commonwealth appoints the governing body of the University convinces us that the University is sufficiently an "arm" of the state, ... to be immune from damage suits under the Eleventh Amendment.

(Citations omitted.)

■ It has been held that the factors to be taken into account when determining if a state agency is an alter ego and, therefore, entitled to protection of the eleventh amendment are whether it performs a governmental function, whether it functions with substantial autonomy, to what extent it is financed independently of the state treasury, and if a judgment sought to be entered against the agency will be satisfied out of the state treasury. *Unified School District No. 480 v. Epperson,* 551 F.2d 254 (10th Cir.1977), *vacated and remanded on other grounds,* 435 U.S. 948, 98 S.Ct. 1572, 55 L.Ed.2d 797 *point reiterated on remand,* 583 F.2d 1118 (10th Cir.1978); *Miller-Davis Co. v. Illinois State Toll Highway Authority,* 567 F.2d 323 (7th Cir.1977). *Compare Lake Country Estates v. Tahoe Planning Agency,* 440 U.S. 391, 400–02, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979) (a bi-state agency held not entitled to eleventh amendment immunity where, among other things, it was not funded by the state and the compact creating it expressly provided that its obligations would not be binding on either state); *Harden v. Adams,* 760 F.2d 1158, 1163 (11th Cir.1985); *Cancel v. San Juan Construction Co.,* 387 F.Supp. 916, 918 (D.P.R.1974).

The Culebra Conservation and Development Authority is attached to the Department of Natural Resources of Puerto Rico, where its main office is located. Its seven-member Board of Directors includes the Puerto Rico Secretary of Natural Resources who presides over the Board and six others, appointed by the Governor of Puerto Rico. It is in charge of "the formulation, adoption and administration of plans and programs for the conservation, use and development of Culebra," P.R.Laws Ann. tit. 21, § 890c (1985), and of "carry[ing] out the public policy of the Commonwealth of Puerto Rico," § 890d. Its property is exempt from any kind of taxes, and it can accept donations in the name of the Commonwealth of Puerto Rico, § 890d. It can acquire property through condemnation. *Id.* The President of the Board of Directors of the Authority certified in a sworn statement that the agency would not have the funds to satisfy a judgment and that such would have to be satisfied from the general budget of the Commonwealth of Puerto Rico. Appellees assert in their brief that the Authority "does not have financial independence since it receives its funds from the state treasury provided yearly in the general budget." Appellants do not controvert this statement.

■ From all the above, notwithstanding its capacity to sue and be sued in the Puerto Rico courts,[9] we conclude that the Culebra Conservation and Development Authority is an arm of the Commonwealth of Puerto Rico, not an independent entity, and as such, enjoys the protection of the eleventh amendment in cases of this nature where its members are sued in their official capacities for actions falling within official duties of the Board.

We hold, therefore, that insofar as appellants have sued the defendants in their official capacities, seeking recovery implicitly against the Treasury of Puerto Rico for the latter's alleged unlawful taking, they are barred by the eleventh amendment.

Appellants point out, however, and we acknowledge, that they have sued the Plan-

**9.** Where a statutory provision exists allowing a state agency to be sued, it does not necessarily follow that the legislature has waived the eleventh amendment and has consented to let the state be sued for money damages not only in a state but in a federal court. A waiver is found only where it is manifest that waiver *of the eleventh amendment* was intended. *Della Grotta v. Rhode Island,* 781 F.2d 343, 346–47 (1st Cir.1986).

ning Board and the Authority members not only in their official capacities but also as individuals, claiming that these defendants are personally liable in damages under 42 U.S.C. § 1983 for alleged violations of federal rights. The eleventh amendment would not bar such a claim, since the action is against the officials personally, and any award of damages would be executed only against each official's personal assets, not Puerto Rico's Treasury. *Kentucky v. Graham*, 105 S.Ct. at 3105.

■■■ The doctrines of absolute and qualified immunity, however, do bar plaintiffs' claims against defendants as individuals. The violation of a federal right asserted here results from the alleged illegality of the "P" and "RO–25–C" zoning regulations enacted by the Puerto Rico Planning Board. Under Puerto Rico law, the Planning Board has been granted the authority to promulgate zoning regulations for all of Puerto Rico, including for Culebra. P.R. Laws Ann. tit. 23, §§ 62 *et seq.* (1983). Insofar as the past and present members of the Planning Board are being sued for having enacted these regulations, they are being sued in a legislative capacity and are absolutely immune. *Lake Country · Estates v. Tahoe Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1978). Like the Tahoe Planning Agency, the Puerto Rico Planning Board does not act at a "purely local level," hence we need not inquire whether purely local entities have legislative immunity. *Id.* at 404 n. 26, 99 S.Ct. at 1178 n. 26. *But see Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 511–14 (8th Cir.1980) (members of a city board of directors absolutely immune from damages action brought against them individually on account of their adoption of an amendment to the city's zoning ordinance); *Bruce v. Riddle*, 631 F.2d 272 (4th Cir. 1980) (county council members absolutely immune for their actions in adopting controverted zoning ordinances).

■■■ We recognize that the defendants not only include the members of the Planning Board but also the members of the Culebra Conservation and Development Authority. The Authority did not enact, nor was it empowered to enact, the "P" and "RO–25–C" zoning which froze plaintiffs' land, hence its individual members would seem to lack legislative immunity as such.[10] But in the cases of the Authority defendants, we do not believe plaintiffs have stated a legally sufficient claim for relief against them. The complaint alleges, conclusorily, that the Authority members "conspired" with the members of the Planning Board to freeze appellants' property; that they were arbitrary, capricious, reckless and/or callous in regard to plaintiffs' federal rights; that they intended to prevent all reasonable or beneficial use of plaintiffs' property when they refused to appropriate it (the Authority possesses eminent domain powers); and that, in pursuance of a conspiracy, the Authority members personally and individually approved the "Plan de Manejo de Culebra" which "served as the basis for the subsequent classification of plaintiffs' property in either zoning district P or RO–25–C." The complaint further alleged,

> Said "Plan de Manejo de Culebra" approval was arbitrary, capricious, and unreasonable, as it was adopted without a thorough analysis and absent of any reasonable scientific data to support its conclusions resulting in the destruction of all but the base residual value of plaintiffs' property.

Stripped of pejorative words, the complaint says little more than that the Authority had some unspecified duty to condemn plaintiffs' land and that its members joined in an ill-considered recommendation that the Planning Board enact the challenged zoning provisions. We fail to see that the alleged conduct violated the Constitution or federal law. The mere drum-beat repetition of words such as "arbitrary," "capricious," and "conspiracy" do not suffice to turn lawful conduct into a violation of federal rights. This court has not looked with

---

**10.** There is mention in at least one case of a concept of derivative immunity, but, like the Eighth Circuit, we do not pursue the matter here. *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d at 614.

favor on complaints which, trading on mere conclusory charges, fail to set out the specifics of a tenable claim. *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982).

The most we find here of possible substance is that individual Authority members, in concert with members of the Planning Board, aided and abetted the latter's promulgation of allegedly unconstitutional zoning regulations. One who conspires with state actors to violate another's civil rights under color of state law may be liable under section 1983. *Adickes v. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Something more, however, than simple endorsement and encouragement of legislation that turns out to be unconstitutional is a necessary element of a section 1983 claim based upon a conspiracy theory. *See Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d at 614–15. Responsibility for ascertaining the constitutionality of enacted legislation will ordinarily rest with the legislating body. Absent factors such as bribe-taking or other criminal misconduct, considerations of free speech normally militate against finding the basis for section 1983 damages in the advocacy of programs and legislation, even if the programs or statutes are themselves unconstitutional. *Id.*

Even if the above were not so— even if members of the Planning Board were not absolutely immune[11] or a claim against the Authority members were sufficiently stated—it appears that the individual defendants are shielded by qualified immunity. When in 1978 certain of the Planning Board defendants refused to relieve plaintiffs from the effects of the zoning regulations, this court had not yet decided *Urbanizadora Versalles v. Rivera Rios*, 701 F.2d 993, 996–97 (1st Cir.1983), holding that the freezing of land for as long as 14 years is an unconstitutional deprivation justifying an injunction. And while we primarily look to case law construing the federal Constitution—not to state legislative enactments—to determine whether, when a state official acted, a reasonable person would have known that his conduct violated clearly established federal statutory or constitutional rights, it is of some moment that the Puerto Rico legislature, as recently as in 1979, authorized public use zoning for at least eight years. As defendants' zoning of plaintiffs' land conformed generally with local statutory law and practice, it is arguably less likely that a reasonable person would have known that this conduct violated established federal rights. To be sure, we mentioned in *Urbanizadora* that the United States Court of Claims, in 1977, had held that a five-year freezing was unreasonable, but we also there declined to indicate whether we would find "so short a period unconstitutional." *Id.* at 997. Given the uncertainty of the law in this area, which we recognized in 1983, and which has persisted to this day, to which this opinion bears some witness, we believe, although the question is not an easy one, that during the period relevant to this case the law was not clear enough to defeat the qualified immunity of these officials against a subsequent personal damages action.

For all the mentioned reasons, we are of the opinion that plaintiffs may not recover in damages.

*Affirmed.*

---

**11.** It is possible to argue that the members of the Planning Board acted in an administrative capacity and were not cloaked in absolute legislative immunity, when in 1978 they refused to rule favorably on plaintiffs' request to be exempted from the zoning restrictions enacted in 1975. *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d at 611 n. 5, 615. We take no position on this question.