**L.A. RAY REALTY et al.**

v.

**The TOWN COUNCIL OF THE TOWN OF CUMBERLAND et al.**

No. 96–207–Appeal.

Supreme Court of Rhode Island.

July 17, 1997.

204

Michael A. Kelly, Elizabeth McDonough Noonan, Providence, for Plaintiff.

John R. Mahoney, Peter Mathieu, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the cross-appeals of the plaintiffs, L.A. Ray Realty (L.A.Ray), Richard Savage, and G. Robert Savage (collectively the Savages),[1] and the defendants, the Town Council (town council) of the Town of Cumberland, Rhode Island (town) by and through its members, the Town Planning Board (planning board) by and through its members, and the town by and through its treasurer, George Cross. The parties appealed from a Superior Court judgment that awarded damages to the plaintiffs on the grounds that the town had engaged in tortious interference with the plain-

---

1. In May 1991, Savage Bros., Inc., was dissolved, pursuant to G.L.1956 § 7–1.1–85. On February 22, 1993, an Assignment of Cause of Action and Related Claims was made by Savage Bros., Inc., in favor of G. Robert Savage and Richard Savage as tenants in common. G. Robert Savage and Richard Savage were then substituted as the parties in interest in this action.

tiffs' prospective economic advantage. For the reasons stated below, we affirm in part and reverse in part the trial justice's decision. A summary of the facts relevant to the issues raised on appeal follows, with additional facts presented in the discussion of the issues.

### Facts and Procedural History

The plaintiffs were engaged in real estate projects, including the development of parcels of land into single-family residential lots, the sale of the lots, and the construction of homes on the lots. At trial, plaintiffs presented extensive testimony that tended to establish that certain town officials harbored a particular personal and political animus toward plaintiffs.

On September 28, 1987, the planning board adopted new subdivision regulations that included a "grandfather's rights" clause:

"[T]hose applications that have been submitted for subdivisions as of the date of passage of these Regulations will be permitted to continue under the Regulations in effect prior to adoption of these Regulations."

Prior to September 29, 1987, L.A. Ray and the Savages had submitted to the planning board applications for the subdivision of certain of their properties located in an Agricultural–A district [2] of the town. On October 7, 1987, the town council amended the town zoning ordinance to incorporate the new regulations, specifically exempting from the new minimum-lot-size requirements all lots of record and all subdivisions filed with the planning board as of September 28, 1987.

On April 20, 1988, Marlene Smith (Smith), a member of the town council, proposed an amendment to the town zoning ordinance that would require a two-acre-minimum lot size for residential or agricultural use in Agricultural–A and Agricultural–B districts, except for lots of record. The town council held two public hearings at which the town mayor, Francis Stetkiewicz (Stetkiewicz), tes-

tified in favor of the proposed amendment. The plaintiffs also appeared at both hearings and presented expert testimony in opposition to the proposal. The amendment was ultimately defeated by the town council.[3] In July 1988, Smith again proposed increasing the minimum residential lot size to two acres in Agricultural–A and –B districts, except for lots of record and subdivisions filed with the planning board as of September 28, 1987. At the mandatory public hearing, held on August 3, 1988, Stetkiewicz, Harvey Salvas (Salvas), who was the town building and zoning officer, and several townspeople testified in favor of the amendment, and plaintiffs again presented testimony opposing the proposal. Following the hearing, the town council again rejected the proposal.

Shortly thereafter, a town resident circulated a petition drafted with the assistance of the town solicitor, Thomas F. Almeida (Almeida), requesting that the following referendum be placed on the November 1988 ballot:

"All land zoned Agricultural A or B in the Town of Cumberland shall require a minimum lot size of 2 acres except for pre-recorded lots. This Act shall take effect immediately upon regular validation of the vote if a majority of electors voting on this referendum item in the Town of Cumberland shall approve."

On September 8, 1988, in a letter to the Secretary of State, Almeida requested that the following question be placed on the November ballot for consideration by the town electorate:

"Shall the minimum lot size for all land zoned Agricultural A or Agricultural B within the Town of Cumberland be two (2) acres?"

In that same letter, Almeida asserted that "[t]he question, if approved, would be inserted in the Zoning Ordinance as paragraph # 7 in Article Three and said Article Three would be amended thereby to read as per the attached text." The "attached text" was a copy of article 3 of the town zoning ordinance

---

2. The town has permitted the construction of single-family residential structures on property zoned Agricultural–A since 1987.

3. While the proposed amendment was pending, L.A. Ray submitted an application to subdivide another parcel of property as part of the same development for which L.A. Ray had submitted the pre-September 29, 1987 application.

as it would read if the referendum passed. Section 1 contained the new language providing for the two-acre minimum-lot-size requirement in Agricultural–A and –B districts, and section 2 contained a grandfather's rights provision, applicable to "[a]ll lots of record and all subdivisions filed with the planning board as of September 28, 1987." Stetkiewicz and Smith campaigned publicly for approval of the referendum. On November 8, 1988, the town electorate approved the referendum.

At the time the referendum was approved, plaintiffs' subdivision applications and other applications proposing lots of less than two acres in Agricultural–A and Agricultural–B districts were pending at various stages before the planning board. On November 21, 1988, the planning board denied all pending applications to subdivide property in an Agricultural–A district, including plaintiffs' applications, on the grounds that the subdivision plans failed to comply with the new two-acre-lot requirement.

The Savages had no notice that the planning board intended to take any action on November 21, 1988, in respect to its application. At trial, Kenneth Pascale (Pascale), the planning board chairman, testified without contradiction that, as of that date, the Savages' proposed West Valley subdivision had satisfied all regulations except for the two-acre minimum-lot-size requirement. At the request of the planning board, L.A. Ray had divided its Long Brook subdivision application into four parts or sections. Although L.A. Ray had notice that section 2 of the Long Brook application was on the agenda for final plat consideration on November 21, 1988, it was not notified that the board planned to take any action regarding sections 1, 3, and 4. At trial, Steven Clarke (Clarke), an expert in civil engineering in the area of subdivision planning and layout, presented uncontroverted testimony that, at the time the applications were denied, sections 1 and 2 of the proposed Long Brook development complied with all subdivision regulations, with the exception of the two-acre-lot-size requirement.

On January 18, 1989, the town council adopted an amendment to the town zoning ordinance, incorporating the two-acre minimum-residential-lot-size requirement in Agricultural–A and –B districts, effective as of November 16, 1988, the date on which voter approval of the referendum was certified by the board of canvassers.

Following the November 21, 1988 denial of their applications, plaintiffs brought an action for writ of mandamus in the Superior Court to compel the board to hear their applications. The trial justice found that plaintiffs were entitled to detrimental-reliance hearings before the planning board.

On January 26, 1989, plaintiffs also filed a complaint in the Superior Court, challenging the validity of the zoning-ordinance amendment. On January 23, 1990, plaintiffs' motions for summary judgment were denied, while defendants' motion for summary judgment, which was treated as a motion to dismiss, was granted. On appeal, this Court invalidated the referendum-initiated zoning ordinance, holding that the initiative or referendum process was inconsistent with public-notice-and-hearing requirements for the adoption or amendment of subdivision regulations or zoning ordinances, as set forth in G.L.1956 chapters 23 and 24 of title 45. *L.A. Ray Realty v. Town Council of Cumberland,* 603 A.2d 311 (R.I.1992).

On July 17, 1989, the detrimental-reliance hearings were held on the subdivision applications of L.A. Ray and the Savages, following which the planning board denied plaintiffs' applications. L.A. Ray appealed the board's decision, and hearings were held before the zoning board in September, October, and December 1990. Stetkiewicz and Smith appeared at the October 1990 zoning board hearing and testified against the granting of L.A. Ray's application. Stetkiewicz also cross-examined witnesses presented by L.A. Ray. After the zoning board denied its appeal, L.A. Ray appealed to the Superior Court, which appeal was mooted by this Court's decision in *L.A. Ray Realty v. Town Council of Cumberland,* 603 A.2d 311 (R.I. 1992).

On March 8, 1994, plaintiffs filed a second amended complaint in the Superior Court in which they sought damages against the town for alleged substantive and procedural due

process violations and intentional interference with prospective economic advantage. Following a nonjury trial, the trial justice concluded that plaintiffs were not deprived of any federal substantive or procedural due process right. The trial justice did find, however, that the town had committed the tort of interference with plaintiffs' prospective contractual relations or prospective economic advantage and was therefore liable for any damage that such interference may have caused plaintiffs.

On June 26, 1995, the trial justice found that L.A. Ray and the Savages had proven damages in the amount of $778,114.81 and $316,628.00, respectively. The trial justice then determined that, because the town was engaged in a governmental function at the time the tort was committed, the amount of damages that L.A. Ray and the Savages were each entitled to receive was limited to $100,000, without interest and costs, pursuant to the Governmental Tort Liability Act, G.L.1956 chapter 31 of title 9. Judgment was entered on August 3, 1995, following which the parties filed the instant appeals. On appeal, the town argued that the trial justice erred in calculating plaintiffs' damages, whereas L.A. Ray and the Savages contended that the trial justice improperly limited their respective damages to $100,000 each, without interest and without costs. The plaintiffs also challenged the trial justice's finding that the town had not violated plaintiffs' substantive and procedural due process rights.

### Damages for Interference with Prospective Contractual Relations

The trial justice found that the elements of the tort of interference with prospective contractual relations had been established in this case, and awarded plaintiffs damages based on their loss of prospective profits. In their cross-appeals, both parties contended that the trial justice erred in calculating the award of damages. In accordance with our well-settled standard of review, "[t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I. 1995).

■ The basic elements of interference with prospective contractual relations are "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." *Mesolella v. City of Providence,* 508 A.2d 661, 669 (R.I.1986).

■ In the case before us, defendants conceded that plaintiffs proved the first two elements of the tort. We are of the opinion that the remaining elements were also proved. The actions of the mayor and the town solicitor demonstrated an obvious intent to interfere with plaintiffs' legitimate expectancy of developing their property under the regulations in effect when plaintiffs filed their subdivision applications. Proof of causation in this tort requires proof "either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." *Mesolella,* 508 A.2d at 671. We have determined that causation has been proved in this case because, but for the town's interference, plaintiffs' expectations regarding their proposed subdivisions would have been realized. In addition, we shall not disturb the trial justice's finding that "the defendant Town of Cumberland has engaged in tortious conduct, for which it is liable in damages."

■ This Court has held that damages for interference with prospective contractual relations include "(1) the pecuniary loss of the benefits of the prospective relation and (2) consequential losses for which the interference is a legal cause." *Mesolella,* 508 A.2d at 671. In *Smith Development Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 214, 308 A.2d 477, 483 (1973), we concluded that the loss of prospective profits, if properly established, constitutes a proper basis for the award of damages for tortious interference with a contractual relationship. We further held that

the plaintiffs were entitled to recover their loss of prospective profits if "such loss [was] established with reasonable certainty." *Id.* at 212, 308 A.2d at 482.

We conclude from the record that sections 1 and 2 of Long Brook were at the final plat stage in the subdivision-approval process when their applications were denied, and that the only basis for denial was that the lots did not comply with the wrongfully imposed two-acre-minimum-size requirement. On the other hand, sections 3 and 4 were not yet ready even for a preliminary plat to be submitted, and consequently, approval could have been denied for a number of unforeseen reasons. Therefore, we concur with the trial justice who determined that L.A. Ray was reasonably certain to realize a net profit from the sale of sections 1 and 2, whereas any expectation of profits from the sale of lots in sections 3 and 4 had not been established "with the requisite degree of reasonable certainty to be the basis for an award of damages." The trial justice also determined that the gross revenue from the sale of the lots in sections 1 and 2 would have been 41 percent of the total projected revenue from the sale of the lots in all four sections of Long Brook, and that the net profit from the sale of all lots in Long Brook would have been $1,897,-841. Hence, the trial justice found that L.A. Ray had proven to a reasonable degree of certainty that it had lost profits in the amount of 41 percent of $1,897,841, or $778,-114.81.

■ Although we agree with the trial justice's determination of L.A. Ray's lost profits incurred by reason of the invalid zoning ordinance, we are of the opinion that the damage award may overcompensate plaintiff for its lost profits. Because L.A. Ray still owns property it could sell or develop, L.A. Ray might reap double profits on the eventual sale or development of this land after the invalid zoning inhibition has been eliminated. We hold, therefore, that the trial justice erred in failing to consider reducing the damages awarded to L.A. Ray by proceeds to be derived from subdividing and selling its property after the invalid zoning limitations were removed, or reduction by the value of the potential property development rights that

L.A. Ray owns. Therefore, we remand this case to the Superior Court for a redetermination of the proper amount of L.A. Ray's damages.

In respect to the Savages, we have gleaned from the record that the West Valley development had complied with all subdivision regulations when its application was summarily denied on November 21, 1988, solely on the basis of the invalid referendum amendment. Therefore, we agree with the trial justice's conclusion that the Savages were reasonably certain to have realized a net profit had they been permitted to develop and market the West Valley lots as planned. The trial justice determined that the Savages had proven with a reasonable degree of certainty that they had incurred a loss of profit of $345,287 less the mitigation of $28,659, derived from the sale of the West Valley property prior to trial, for total damages in the amount of $316,628. Because the trial justice neither overlooked nor misconceived material evidence nor was otherwise clearly wrong in determining the Savages' total damages, we will not disturb his findings thereon.

■ At trial, the town pleaded governmental immunity as an affirmative defense to plaintiffs' claims. This Court has explained that "[t]he public-duty doctrine protects the state and its political subdivisions from tort liability arising out of the performance of governmental functions not commonly undertaken by private entities." *St. James Condominium Ass'n v. Lokey,* 676 A.2d 1343, 1346 (R.I.1996). We have no doubt that the adoption and application of a zoning ordinance is a governmental function, and we concur with the trial justice's identical finding in this respect.

An exception to the public-duty doctrine exists, however, when the state or its political subdivisions engage in "egregious conduct." *Boland v. Town of Tiverton,* 670 A.2d 1245, 1248 (R.I.1996); *Houle v. Galloway School Lines, Inc.,* 643 A.2d 822, 825–26 (R.I.1994). We are of the opinion that the town's adoption and enforcement of an invalid ordinance in order to interfere with plaintiffs' legitimate expectations regarding their property amounted to egregious misconduct, and con-

sequently deprived the town of governmental immunity from tort claims. Therefore, we agree with the trial justice's finding that the conduct of the governmental officials in this case "fulfills the standard of egregious misconduct, which would bar the application of the public duty exception to the governmental tort claims act."

■ Further, we are of the opinion that § 9–31–3 of the Governmental Tort Liability Act applies in this case and therefore sets a limit on the amount of damages for tortious interference with prospective contractual relations. Section 9–31–3 provides:

> "**Limitation of Damages—Cities and towns, fire districts.**—In any tort action against any city or town or any fire district, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000) provided, however, that in all instances in which said city or town or fire district was engaged in a proprietary function in the commission of such tort, the limitation of damages set forth in this section shall not apply."

Because the town was engaged in a governmental, and not a proprietary, function when it committed the tort, the trial justice properly limited plaintiffs' damages to $100,000 each, pursuant to § 9–31–3. We have also held that the Governmental Tort Liability Act compensates a plaintiff only for damages, and we have "decline[d] to expand the liability of the state and municipalities to include interest and costs." *Mulvaney v. Napolitano,* 671 A.2d 312, 313 (R.I.1995) (citing *Andrade v. State,* 448 A.2d 1293 (R.I. 1982)). We conclude, therefore, that the trial justice properly limited plaintiffs' damages in this tort action to $100,000, without interest and costs.

### Due Process Claims

The plaintiffs also contended that the trial justice erred when he found that the town had not deprived plaintiffs of their constitutionally protected property interests. The plaintiffs argued that the town, by denying them the opportunity to develop their land, had violated the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, thereby entitling plaintiffs to damages under 42 U.S.C. §§ 1983 and 1988.

The Fifth Amendment to the United States Constitution provides in pertinent part that: "[n]o person shall be * * * deprived of life, liberty, or property, without due process of law." The amendment is applicable to the states and their subdivisions through the due process clause of the Fourteenth Amendment: "No state shall * * * deprive any person of life, liberty, or property, without due process of law."

The federal statute that plaintiffs have invoked provides under 42 U.S.C. § 1983 that:

> "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,"

and 42 U.S.C. § 1988(b) provides that:

> "[i]n any action or proceeding to enforce a provision of [§ 1983] * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

In *Jolicoeur Furniture Co. v. Baldelli,* 653 A.2d 740, 749 (R.I.), *cert. denied,* —— U.S. ——, 116 S.Ct. 417, 133 L.Ed.2d 335 (1995), this Court pointed out, citing *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 503, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172, 179 (1982), that under 42 U.S.C. § 1983, the court is interposed between the state and the people in order to protect the people from unconstitutional actions under color of state law by the Executive, the Legislature, or the Judiciary. It is well settled that municipalities are "persons" for purposes of § 1983, subject to suit when they engage in the deprivation of constitutionally protected rights. "Local governing bodies * * * can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where * * * the action that is alleged to be unconstitutional implements

or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611, 635 (1978).

We have held that "[t]he first inquiry in any § 1983 suit * * * is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' of the United States." *Jolicoeur,* 653 A.2d at 750 (quoting *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433, 439 (1979)). In *Jolicoeur,* we concluded that, although the defendants there had breached their contract with the plaintiffs and tortiously interfered with the plaintiffs' contract, the plaintiffs failed to demonstrate that the defendants had deprived them of any constitutionally protected property rights. 653 A.2d at 755.

By contrast in the case before us, the trial justice found that as of November 21, 1988, the West Valley development and sections 1 and 2 of the Long Brook development had complied with all applicable regulations, and that the planning board denied these applications solely because the residential lots did not comply with the new, invalid two-acre minimum-lot-size requirement. The trial justice concluded that because the only basis for denial was the application of the town's invalid referendum amendment, plaintiffs were entitled as a matter of law to final approval of those subdivisions. *See Jeffrey v. Platting Board of Review of South Kingstown,* 103 R.I. 578, 587, 239 A.2d 731, 737 (1968) (holding that planning board had no discretion to disapprove plat that conformed to board's rules). L.A. Ray failed, however, to prove a similarly protected property interest in sections 3 and 4 of Long Brook because those sections were still at a preliminary stage and could have been denied for "a myriad of unforeseeable reasons." Accordingly, the trial justice did not award L.A. Ray damages for lost prospective profits from sections 3 and 4 of the Long Brook subdivision. On the basis of the record, we are led to the same conclusion as that of the trial justice, namely, that plaintiffs were entitled to approval of the West Valley development and of sections 1 and 2 of Long Brook,

and that this entitlement amounted to a constitutionally protected property interest.

In its interpretation of 42 U.S.C. § 1983, the United States Supreme Court has described three kinds of claims that may be brought against a state under the due process clause of the Fourteenth Amendment. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100, 113–14 (1990). First, because the due process clause incorporates many protections enumerated in the Bill of Rights, 42 U.S.C. § 1983 claims may include violation of free speech rights or unreasonable searches and seizures by state officials. Second, and important in the case before us, the due process clause prohibits "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 113 (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986)). In these two types of claims, "the constitutional violation actionable under § 1983 is complete when the wrongful action is taken." 494 U.S. at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 113. A third protection under the due process clause guarantees a fair procedure. In a 42 U.S.C. § 1983 action brought under a claim of a violation of procedural due process, the applicable state remedy is critical in determining whether the state's deprivation of life, liberty, or property occurred without due process of law, in which case the action would be held unconstitutional. *Id.* at 125–26, 110 S.Ct. at 983, 108 L.Ed.2d at 114.

Generally, due process requires "some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115. "In some circumstances, however * * * a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process," *id.* at 128, 110 S.Ct. at 984, 108 L.Ed.2d at 115, "simply because they are the only remedies the State could be expected to provide." *Id.* at 128, 110 S.Ct. at 985, 108 L.Ed.2d at 116 (citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). For example, because the state

cannot anticipate and control a negligent deprivation of property by a state actor, *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420, 432 (1981) (*overruled in part not relevant here,* by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)), or a deprivation caused by "the random and unauthorized intentional conduct of its employees," *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393, 407 (1984), the state is not in a position to provide predeprivation process in such instances, and an adequate postdeprivation remedy satisfies due process.

In the case before us, predeprivation hearings were possible and indeed were provided to plaintiffs. This predeprivation process was meaningless, however, because of the actions of town officials. Therefore, the animosity and actions of some town officials resulted in a procedural due process violation, regardless of the availability of a post-deprivation remedy. Moreover, because of the limitation on damages under the Governmental Tort Liability Act, the available post-deprivation remedy was also inadequate. On the basis of these considerations and our determination that plaintiffs' claims fall within the second and the third categories of claims under 42 U.S.C. § 1983, we hold that plaintiffs have been denied, respectively, their substantive and their procedural due process rights.

### Substantive Due Process Violations

"Substantive due process, as opposed to procedural due process, addresses the 'essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible.'" *Jolicoeur,* 653 A.2d at 751 (quoting *Amsden v. Moran,* 904 F.2d 748, 753 (1st Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991)). A regulation that takes property violates the substantive due process clause if it is arbitrary, discriminatory, or irrelevant to a legislative policy. *Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013, 1021 (1st Cir.1989). Furthermore, as to substantive due process claims, "the constitutional viola-

tion actionable under § 1983 is complete when the wrongful action is taken." *Zinermon,* 494 U.S. at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 114. Moreover, substantive due process prevents the use of governmental power for purposes of oppression, or abuse of governmental power that is shocking to the conscience, or legally irrational action that is not keyed to a legitimate state interest. *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31–32, (1st Cir.), *cert. granted in part,* 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991), *cert. dismissed as improvidently granted,* 503 U.S. 257, 112 S.Ct. 1151, 117 L.Ed.2d 400 (1992).

The substantive due process standard protects individuals against state actions that are "egregiously unacceptable, outrageous, or conscience-shocking." *Jolicoeur,* 653 A.2d at 751 (quoting *Amsden,* 904 F.2d at 754). Substantive due process is violated when "'the constitutional line has been crossed'" by state actions that transgress "some basic and fundamental principle." *Amsden,* 904 F.2d at 754 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Although we affirm the trial justice's findings of fact in this case, we reject his determination that plaintiffs' due process rights were not violated. It is our conclusion that plaintiffs were deprived of their fundamental, constitutionally protected property rights because of the "egregiously unacceptable" and "outrageous" actions of town officials.

We have arrived at this conclusion because, first, the record clearly disclosed that town officials altered the improperly adopted referendum to delete all grandfather's rights provisions and distributed the falsified ordinance to the planning and the zoning boards. Soon after the November 8, 1988 election that improperly approved the two-acre zoning requirement, Stetkiewicz and Almeida met with Salvas and informed him that there were no grandfathered rights under the referendum. At trial, Salvas testified that he was never shown a copy of the September 8, 1988 letter from Almeida to the Secretary of State, which clearly provided for the inclusion of a grandfather's rights clause. In

addition, on November 18, 1988, at either Stetkiewicz's or Almeida's instruction, Salvas issued a memorandum to all department heads, the zoning board, and the planning board, to which was attached the revised article 3, section 1, of the zoning ordinance, setting forth the new minimum-lot-size requirements in paragraph 7. A note to paragraph 7 explained that the new provisions were effective as of November 16, 1988, following the board of canvassers' certification of the results of the voter referendum. Especially harmful was the fact that section 2, which Almeida had submitted to the Secretary of State and which would have excepted plaintiffs' subdivision applications from the new regulations, was absent from the formulation of the "new" article 3.

Prior to the first meeting of the planning board following the referendum approval, the chairman of that board, Pascale, asked Almeida about the effective date of the referendum and whether any provision preserved pending nonconforming subdivisions. Pascale met with Almeida and Stetkiewicz on November 21, 1988, at which time Almeida advised Pascale that there were no grandfather's rights on which the board could grant relief to pending subdivision applications.

Second, it is clear from the record that Stetkiewicz and Almeida defied the Superior Court order regarding plaintiffs' detrimental reliance hearings. On June 13, 1989, the Superior Court ordered the planning board to hold hearings on plaintiffs' subdivision applications to determine whether plaintiffs had detrimentally relied on the regulations in effect prior to the approval of the referendum. The order provided that if the planning board determined that plaintiffs had relied to their detriment on the prereferendum regulations, then the board must consider plaintiffs' proposed subdivisions under the regulations in effect when plaintiffs first submitted their applications, prior to September 29, 1987. In this regard, we note that the parties agreed that, after September 29, 1987, plaintiffs proceeded with the subdivision process in accordance with the pre-September 1987 regulations, "with the expectation that [their] subdivision application[s] would be heard under the 'old regulations.'"

In any event, after the Superior Court order was issued, Stetkiewicz sent a memorandum to the planning board, suggesting how the board should proceed with the hearings. The trial justice found that there was "considerable merit" to plaintiffs' argument that the memorandum constituted "inappropriate intervention and plainly tainted the board's impartiality in view of the mayor's well[-]known attitude toward these applications as well as [toward] the [plaintiffs]." On August 21, 1989, Almeida advised the planning board to apply the two-acre-minimum provision in effect as of November 21, 1988, at the detrimental-reliance hearings. On the basis of this advice that was in clear violation of the Superior Court order, the planning board denied plaintiffs' applications. The trial justice understatedly concluded that, "[w]hile these plaintiffs got a hearing, its fairness is definitely questionable."

Third, the record further revealed that three other applicants, Clara Lavelle, Leo Beauregard, and Robert Grundy, who were in the same position as plaintiffs, were found to have detrimentally relied on the prereferendum regulations and were granted final approval of their subdivisions. The totality of this evidence exemplifies the animus directed by town officials uniquely toward plaintiffs and supports the trial justice's conclusion that, "[t]he town vicariously interfered wrongfully when its executive officials, especially its chief executive, pursued these plaintiffs to the exclusion of all others in the single-minded enforcement and application of the amendment to their proposed subdivisions," and that "the government officials here had a specific intent to harm these plaintiffs." The trial justice further found that "defendant town adopted, applied and enforced an invalid ordinance with the intent to interfere with [plaintiffs'] expectancy of developing and marketing residential lots of less than two acres in agricultural districts," and that "[t]he town directly and wrongfully interfered with the plaintiffs' legitimate expectations by the adoption of the amendment through the referendum approval on November 8, 1988 and the codification of the amendment by its council on January 18, 1989."

On this record, we conclude that the town through its officials acted egregiously, as well as with animus, and without actual or legal basis, to deprive plaintiffs of substantive due process rights. Consequently, plaintiffs are entitled to damages under 42 U.S.C. § 1983 and attorney's fees under § 1988.

### Procedural Due Process Violations

The United States Supreme Court has stated that, "[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon,* 494 U.S. at 125, 110 S.Ct. at 983, 108 L.Ed.2d at 114 (citing *Parratt,* 451 U.S. at 537, 101 S.Ct. at 1914, 68 L.Ed.2d at 430).

▮▮▮ The plaintiffs do not contend that the available due process procedures themselves were inadequate, only that they were deprived of their constitutional rights because town officials blatantly abused their positions. The predeprivation hearings were a sham in which officials rendered decisions that were preordained to deprive plaintiffs of their constitutionally protected property interest, which action, in the absence of an adequate postdeprivation remedy, gave rise to plaintiffs' procedural due process claim. *See Hudson,* 468 U.S. at 533, 104 S.Ct. at 3204, 82 L.Ed.2d at 407 (deprivation of constitutionally protected property interest gives rise to 42 U.S.C. § 1983 procedural due process claim in circumstances in which state fails to provide an adequate postdeprivation remedy).

In *Jolicoeur,* this Court held that the plaintiffs were "unable to claim a violation of procedural due process because * * * an adequate postdeprivation remedy exist[ed] in the form of a common-law action." 653 A.2d at 750 (citing *Parratt,* 451 U.S. at 539, 101 S.Ct. at 1915, 68 L.Ed.2d at 431). In that case, we concluded that the defendants had breached their contract with the plaintiffs as well as tortiously interfered with the plaintiffs' contract. Because the Governmental Tort Liability Act "specifically limits the amount of damages plaintiffs may recover in a *tort* action against the state, a city, or a town," *Jolicoeur,* 653 A.2d at 755, that act was inapplicable in limiting the plaintiffs' damages for their breach-of-contract claim. Consequently, we upheld the full jury award to the plaintiffs in the amount of $340,000 plus interest. *Id.*

The instant case is clearly distinguishable from *Jolicoeur* because here plaintiffs' injury resulted from a tortious activity in which damages were limited under the Governmental Tort Liability Act. In *Monroe v. Pape,* 365 U.S. 167, 173, 81 S.Ct. 473, 477, 5 L.Ed.2d 492, 498 (1961), (*overruled in part not relevant here,* by *Monell v. Department of Social Services of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), the United States Supreme Court explained that 42 U.S.C. § 1983 was intended to provide a remedy for civil rights violations "where state law was inadequate." We are of the opinion that because the statutory limitation on damages under the Governmental Tort Liability Act clearly rendered inadequate the postdeprivation relief available to remedy the due process violations in this case, plaintiffs may recover the full amount of their damages under 42 U.S.C. § 1983.

▮▮▮ In respect to interest on an award of damages, federal courts in 42 U.S.C. § 1983 litigation generally view the availability of prejudgment interest as a question of federal law. *See, e.g., Furtado v. Bishop,* 604 F.2d 80, 97 (1st Cir.1979) (holding that a federal rule should govern the issue of prejudgment interest in § 1983 actions), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). In addition, the award of damages under § 1983 is governed by the principle of compensation. *Carey v. Piphus,* 435 U.S. 247, 254–57, 98 S.Ct. 1042, 1047–49, 55 L.Ed.2d 252, 259–61 (1978). In the First Circuit, the award of prejudgment interest in 42 U.S.C. § 1983 actions is treated as a discretionary element of damages to be decided by the jury. *Blackburn v. Snow,* 771 F.2d 556, 573 (1st Cir.1985); *Furtado,* 604 F.2d at 98. Prejudgment interest may be awarded to a prevailing plaintiff if the factfinder determines that such interest is necessary to make the plaintiff whole. *Blackburn,* 771 F.2d at 573; *Furtado,* 604

F.2d at 97–98. Moreover, state law requirements may not be applied if their application would contravene the purpose of a federal law or policy, or if different outcomes would result depending on whether 42 U.S.C. § 1983 claims were brought in federal or state court, thereby thwarting the federal interest in uniformity. *See Felder v. Casey,* 487 U.S. 131, 138, 153, 108 S.Ct. 2302, 2306–07, 2314, 101 L.Ed.2d 123, 138, 147 (1988) (state's notice-of-claim statute could not be applied to defeat a federal civil rights action brought in state court under 42 U.S.C. § 1983). Therefore, a state limitation on the availability of prejudgment interest may not be applied if such a limitation would contravene the goal of § 1983 to fully compensate the injured party. Consequently, our holding in *Andrade v. State,* 448 A.2d 1293, 1295 (R.I.1982) (state Governmental Tort Liability Act compensates a plaintiff only for damages and prejudgment interest is not an element of damages), is not an impediment to the award of prejudgment interest in those cases in which the trial justice or jury finds that such an award is required to fully compensate a plaintiff in a 42 U.S.C. § 1983 action. Because the trial justice did not address this issue, we remand the question of the award of prejudgment interest to the Superior Court. If the trier of fact finds that interest is required to fully compensate plaintiffs, prejudgment interest may be awarded at the discretion of the trial justice.

In concluding, we note with particularity that our holding in this case does not portend that every rejection of a development project or violation of state law in a zoning case will support a 42 U.S.C. § 1983 claim. It is evident that this case does not represent the routine developer's claim or zoning denial. Here, the plaintiffs were denied substantive due process as a result of the illegal, unauthorized actions by agents of the state acting under color of law. Town officials illegally altered a referendum and distributed the "new," invalid zoning ordinance to the relevant departments and boards, violated a Superior Court order regarding the plaintiffs' right to a hearing, and directly interfered with the plaintiffs' constitutionally protected property interests. Moreover, this egregious conduct was undertaken with express animus toward the plaintiffs and without actual or legal basis. Because the actions of certain town officials rendered meaningless the predeprivation process, and because the postdeprivation remedy under state law is inadequate to compensate the plaintiffs, their procedural due process rights have been violated. Consequently, the plaintiffs were manifestly denied their substantive and procedural due process rights and therefore are entitled to damages under 42 U.S.C. §§ 1983 and 1988.

In summary, we affirm the trial justice's determination that the defendants tortiously interfered with the plaintiffs' prospective economic advantage. We reverse the trial justice's finding that the plaintiffs' federal due process rights were not violated and that the plaintiffs therefore were not entitled to damages under 42 U.S.C. § 1983. The Savages are awarded the full amount of damages as determined by the trial justice, namely $316,-628. This case is remanded to the Superior Court for further proceedings to determine the damages to L.A. Ray after deducting from $778,114.81 the amount attributable to its ownership of the land in question. On remand, the Superior Court is further directed to consider prejudgment interest on damages awarded to both plaintiffs under 42 U.S.C. § 1983, and to determine the amount of the award of attorney's fees under 42 U.S.C. § 1988(b).

GOLDBERG, J., did not participate.

FLANDERS, Justice, concurring in part and dissenting in part.

Although I agree with most of the court's rulings on this appeal and with much of its reasoning in support of these rulings, I write separately because I wish to comment on what I perceive to be the legal significance of several aspects of the court's opinion and because I respectfully disagree with some facets of the majority's analysis.

## I

### The Availability of 42 U.S.C. § 1983 to Enforce Private–Property Rights

In *Jolicoeur Furniture Co. v. Baldelli,* 653 A.2d 740 (R.I.1995), the court refused to

apply 42 U.S.C. § 1983 (" § 1983") to a claim that private property owners had been deprived of their property in violation of their right to substantive due process and to just compensation for a municipality's temporary taking of their property. Noting that the *Jolicoeur* plaintiffs were not members of a distinct, oppressed minority group, the court said that because they were only seeking to enforce a private-property right (a contract to purchase land from the municipality to build their furniture store) as opposed to what it considered to be a fundamental civil right (such as voting rights, jury or job discrimination, school desegregation, or the like), the "plaintiffs have merely stated private claims that address no public right or interest and that are actionable and compensable under state law. We therefore hold as a matter of law that defendants did not take plaintiffs' property in violation of 'the Constitution and laws' of the United States." *Jolicoeur Furniture Co.*, 653 A.2d at 750. The court also rejected the plaintiffs' substantive due process claims because, contrary to what the jury and trial justice had concluded, the court did not believe that either the municipality or the individual governmental officials responsible for interfering with the city's real estate contract with Jolicoeur had acted in a way that was " 'egregiously unacceptable, outrageous, or conscience-shocking.' " *Id.* at 751.

Today, however, the court puts to rest any notion that § 1983 cannot be invoked in a Rhode Island State Court action against local governmental authorities by persons seeking to enforce private-property rights. The plaintiffs here are real-estate developers who seek to maximize the profit they can make from their land holdings. As in *Jolicoeur* plaintiffs are not looking to vindicate any broad public interest but are simply taking steps to enforce their own private-property rights. Their claims do not affect other fun-

damental civil rights such as voting rights, jury or job discrimination, school desegregation, or the like. Nor are they members of any distinct, oppressed minority group. Nonetheless, even though their claims address no other public right or interest (except to employ their land in its most valuable use) and are also actionable and compensable under state law (*see* III, *infra*), the court holds today that § 1983 can be used to vindicate such private-property rights if they are deprived without due process of law.

I agree with this result because the United States Supreme Court has long recognized that there is no distinction under § 1983 between private-property rights and other civil liberties: *both* are equally fundamental and protected by § 1983 and the Federal Constitution. *See Lynch v. Household Finance Corp.*, 405 U.S. 538, 552, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424, 434–35 (1972) ("the dichotomy between personal liberties and property rights is a false one"). In applying § 1983 to a property-rights claim, the United States Supreme Court in *Lynch* stated:

"Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation no less than the right to speak or the right to travel, is in truth, a 'personal' right[.] * * * That rights in property are basic civil rights has long been recognized." *Id.* at 552, 92 S.Ct. at 1122, 31 L.Ed.2d at 435.

As Justice Holmes put it, "Property is protected because such protection answers a demand of human nature, and therefore takes the place of a fight." *Davis v. Mills*, 194 U.S. 451, 457, 24 S.Ct. 692, 695, 48 L.Ed. 1067, 1071 (1904). Moreover, in the more recent private-property-takings case of *Dolan v. City of Tigard*, 512 U.S. 374, 392, 114 S.Ct. 2309, 2320, 129 L.Ed.2d 304, 321 (1994), the United States Supreme Court reaffirmed the proposition [4] that private-property rights stand on an equal constitutional footing with

---

4. Since as early as 1979 the United States Supreme Court has recognized that an action lies under § 1983 for the alleged improper deprivation of private-property rights by a governmental entity. *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 394–400, 99 S.Ct. 1171, 1173–76, 59 L.Ed.2d 401, 405–09 (1979). More recently it has also recognized a direct right of action under the Four-

teenth Amendment for a temporary regulatory taking of private property by a local governmental entity. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250, 264 (1987) (takings claim is "self-executing" under the Fifth and the Fourteenth Amendments to the United States Constitution).

other fundamental personal civil liberties: "We see no reason why the Takings Clause of the Fifth Amendment, as much a part of the Bill of Rights as the First Amendment or Fourth Amendment, should be relegated to the status of a poor relation in these comparable circumstances." *See also Kirchberg v. Feenstra*, 708 F.2d 991, 998–99 (5th Cir.1983) (holding that the mere fact that private and not public rights have been vindicated in a § 1983 claim is not a reason to deny attorney's fees under 42 U.S.C. § 1988).

Accordingly, to the extent the *Jolicoeur* decision purported to preclude § 1983 from being used by private property owners to vindicate their private-property rights in a Rhode Island State Court action, the court today removes that barrier and restores § 1983 to its proper role in a state court action as an important means to remedy local governmental violations of federally protected rights—including the right not to be deprived of one's private property without due process of law.

**II**

**As Owners of Undeveloped Real Estate, Plaintiffs Possessed a Property Interest That Could Not Be Deprived without Due Process of Law**

As previously stated, plaintiffs were real-estate developers who owned undeveloped parcels of land in the town of Cumberland (the town) when the town applied an invalid zoning amendment to their property so as to preclude them from proceeding with a lawful subdivision and sale of the land. When this action occurred, plaintiffs had neither sought nor obtained any building permit for their proposed development projects; they had failed to obtain final approval on any of their subdivision plans; and they had not as yet started to sell, much less to build upon, any of the parcels. Nonetheless, both the trial justice and this court have held that the developer plaintiffs were deprived of a constitutionally protected property interest when the local governmental authorities arbitrarily and irrationally refused to award a

permit for their residential subdivision plans. I believe this result accords with long-standing federal constitutional principles that recognize that "[t]he right of [an owner] to devote [his or her] land to any legitimate use is property within the protection of the Constitution." *Washington ex rel Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121, 49 S.Ct. 50, 52, 73 L.Ed. 210, 213 (1928). "The Due Process Clause guarantees more than fair process * * * [it] specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Washington v. Glucksberg*, —— U.S. ——, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting the plurality opinion in *Moore v. City of East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531, 540 (1977)).

Thus, pursuant to the United States Supreme Court's early zoning cases of *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928), local land-use laws must have a substantial relation to legitimate state interests and may not be arbitrarily or capriciously applied to individual properties and/or to their owners. "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare." *Nectow*, 277 U.S. at 188, 48 S.Ct. at 448, 72 L.Ed. at 844; *see also Nollan v. California Coastal Commission*, 483 U.S. 825, 834 n. 2, 107 S.Ct. 3141, 3147 n. 2, 97 L.Ed.2d 677, 687 n. 2 (1987) ("the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit,'" that is, merely a privilege); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (invalidating zoning ordinance limiting occupants of a "single dwelling unit" to es-

sentially members of a nuclear family as violative of Fourteenth Amendment substantive due process); *id.* at 513, 97 S.Ct. at 1943, 52 L.Ed.2d at 546 (Stevens, J., concurring on the basis of substantive due process protection of property ownership); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450, 463 (1977) (long-term property lessee denied a rezoning permit for development of low-income housing had standing to assert its right to "be free of arbitrary or irrational zoning actions"); *Frank Ansuini, Inc. v. City of Cranston,* 107 R.I. 63, 68–71, 264 A.2d 910, 913–14 (1970) (a planning commission did not have power to require developers to donate a minimum percentage of their proposed subdivision for recreational purposes); Robert E. Riggs, *Substantive Due Process in 1791,* 1990 Wis. L.Rev. 941 (arguing that the "law of the land" was the accepted equivalent of "due process of law" and that the former phrase has historically embraced substantive as well as procedural rules).

The court today confirms that private property owners are entitled to substantive due process protection in connection with local governmental efforts to limit and restrain the use of their property. In the case of *DeBlasio v. Zoning Board of Adjustment,* 53 F.3d 592 (3rd Cir.1995), the Third Circuit articulated the standard to be applied in determining whether a property owner's right to substantive due process has been violated.

"[O]wnership is a property interest worthy of substantive due process protection. * * * Indeed, one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership. Thus, in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached. Where the plaintiff so alleges, the plaintiff has, as a matter of law, impliedly established possession of a property interest worthy of substantive due process protection." *Id.* at 600–01.

Although I agree with the majority's conclusion that defendants' conduct here was indeed egregious, in my view it did not have to be so—much less " 'conscience-shocking,' " *Jolicoeur,* 653 A.2d at 751—for plaintiffs to establish a substantive due process violation. Rather, as indicated by the above-cited authorities, all that had to be shown was that the enactment and application of the new zoning and planning laws to plaintiffs' property was arbitrary and not rationally in furtherance of any legitimate governmental interest. *See Glucksberg,* — U.S. at ——, 117 S.Ct. at 2271, 138 L.Ed.2d at 792 ("[t]he Constitution also requires, however, that [legislation] be rationally related to legitimate government interests"); *Eide v. Sarasota County,* 908 F.2d 716, 721 (11th Cir. 1990) (recognizing substantive due process claim where the plaintiff alleges that a property regulation is "arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals, or general welfare, and is therefore an invalid exercise of the police power"). Such a claim is one alleging that the regulations at issue are arbitrary and capricious either on their face or as applied to a plaintiff's particular piece of property. *See id.* at 722.

### III

### The Alleged Inadequacy of Any Remedy under Rhode Island Law for Due-Process Violations

The majority concludes that "the postdeprivation remedy under state law is inadequate to compensate the plaintiffs" for the procedural and substantive due process viola-

tions that are at issue in this case. The basis for this aspect of the court's ruling is that "the statutory limitation on damages under the Governmental Tort Liability Act clearly rendered inadequate the postdeprivation relief available to remedy the due process violations in this case." However, the $100,000 cap provided for by the Governmental Tort Liability Act, G.L.1956 chapter 31 of title 9, only applies to tort actions against municipalities, not to constitutional claims such as these. *See, e.g., Thompson v. Village of Hales Corners,* 115 Wis.2d 289, 340 N.W.2d 704, 708–09 (1983) (refusing to apply state statutory recovery ceiling to § 1983 claims). Moreover, it has no application to tort suits against the individual governmental officials who perpetrated the due process violations that occurred here. *Pridemore v. Napolitano,* 689 A.2d 1053, 1056 (R.I.1997) (appending unpublished decision in *Hudson v. Napolitano,* No. 86–291–A. (R.I., filed May 20, 1987), holding that statutory tort cap does not apply to an individual governmental official's own tortious actions). The plaintiffs have not shown that pursuing a damages remedy against these individuals for their tortious misconduct would be inadequate. Indeed in *Jolicoeur* the court affirmed a tortious-interference damages award against the individual municipal officials who were responsible for the interference with a contract that was at issue in that case. *Jolicoeur,* 653 A.2d at 753 ("[a]lthough defendants here may have had good motives because of the potential loss of state funds to the city, they were not legally justified in their attempt to obstruct the successful completion of the contract between the city and plaintiffs"). Thus I see no reason why such a remedy would be inadequate in this case.

Moreover, in addition to pursuing individual tort actions against the municipal officials responsible for the interference with plaintiffs' prospective economic advantages, article 1, section 2, of the Rhode Island Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Before Rhode Island's Constitution was amended in 1986, article 1, section 2, had been held to be merely advisory and not mandatory in nature because it had been addressed to the General Assembly as advice and direction rather than to the courts as a restraint on the legislative power. *See Sepe v. Daneker,* 76 R.I. 160, 168, 68 A.2d 101, 105 (1949). All this changed in 1986 when the framers of the new State Constitution decided to add equal-protection, due process, and antidiscrimination clauses to this section of our state constitution. "The intent of the resolution [adding these clauses] was to include the due process and equal protection language of the 14th Amendment to the U.S. Constitution in the Rhode Island Constitution. The Committee Report stated that including these protections in the state Constitution 'would create an independent state foundation for individual rights.'" Constitution of the State of Rhode Island and Providence Plantations at 2 (annotated edition published by the Office of Secretary of State—1988).

Accordingly, Rhode Island's constitution now includes the due process protections that are part of the Fourteenth Amendment to the United States Constitution. To fulfill the framers' intention that these new rights would "'create an independent state foundation for individual rights,'" it would appear axiomatic that our state courts are required to remedy any violations of due process under this provision of the Rhode Island constitution. *See also* R.I. Const., art. 1, sec. 5 ("[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character").

Moreover, we have long had a provision in our State Constitution prohibiting takings for public use without just compensation. *See* R.I. Const., art. 1, sec. 16 ("[p]rivate property shall not be taken for public uses, without just compensation"). In *Annicelli v. Town of South Kingstown,* 463 A.2d 133 (R.I.1983), this court recognized that an inverse condemnation action would lie under the takings clauses of *both* the State and Federal Consti-

tutions for governmental regulations that deprive property owners of all beneficial use of their land without just compensation.

These state constitutional provisions provide property owners like these plaintiffs with adequate post-deprivation damages remedies for any alleged due process and takings violations. *Cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (holding a damages remedy exists directly under the Federal Constitution for Fourth Amendment violations). Moreover, any such state constitutional damage remedies would not be subject to the statutory cap on tort claims against state and municipal entities. (The $100,000 cap only applies to tort claims against state or municipal governmental entities, not to constitutional claims such as alleged due process and takings violations and not to breach-of-contract claims like those prosecuted to judgment in *Jolicoeur.*) Moreover, the cap would not apply to claims against state government officials sued in their individual capacities.

Nonetheless, despite the adequacy of Rhode Island's post-deprivation-damage remedies for due process violations, plaintiffs here were still entitled to a meaningful predeprivation notice and hearing before their property could be rezoned, one which they failed to receive. Accordingly, I believe that plaintiffs' federal procedural due process claims were actionable even though Rhode Island provides adequate post-deprivation-damage remedies for such violations. In this case, the municipality's failure to provide a meaningful predeprivation notice and hearing was not the result of random and unauthorized acts by low-level governmental officials. *Cf. Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393, 407 (1984) ("when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur"). Rather, it occurred when several of the highest policy-making officials in the town of Cumberland decided (for improper purposes) to apply a new, two-acre zoning

scheme to plaintiffs' property without following the requisite preadoption notice-and-hearing procedure for doing so. Thus in this situation no postdeprivation hearing would remedy the failure to comply with the predeprivation notice-and-hearing mandates of state zoning laws, let alone with the state and federal constitutional imperatives to provide such predeprivation process. Thus, to avoid a procedural due process violation, the requisite notice and hearing for this type of a zoning change has to precede any property deprivation irrespective of the adequacy of the state's post-deprivation-damage remedies for such a violation.

## IV

**Depriving Persons of Property without Due Process of Law Results in Greater Damages Than if the Property Is Lawfully Taken by Eminent Domain**

Because plaintiffs prevailed on their § 1983 claims, they are entitled to full compensatory damages, including any lost profits that they can prove with reasonable certainty. *Carey v. Piphus,* 435 U.S. 247, 255–58, 98 S.Ct. 1042, 1047–49, 55 L.Ed.2d 252, 259–61 (1978) (applying what it called the "compensation principle," the court observed that damage concepts from tort law will often be helpful in awarding damages in § 1983 cases). However, in eminent-domain proceedings, owners of unimproved property are not generally entitled to recover for anticipated but unrealized future profits. *O'Donnell v. State,* 117 R.I. 660, 665, 370 A.2d 233, 236 (R.I.1977) (citing 4 Nichols, *Eminent Domain* § 13.3 at 13–148.2, 13–161 (3d ed.1976)). Rather the measure of damages is the fair market value of the unimproved land as and when it was taken by the government. *Ocean Road Partners v. State,* 612 A.2d 1107, 1110 (R.I.1992). Although the value of the land should reflect its current market potential, the award does not normally include lost future profits.

Moreover, prevailing plaintiffs in § 1983 cases are entitled to an award of their reasonable attorney's fees under 42 U.S.C. § 1988. In an eminent-domain proceeding

the property owners have no such entitlement.

Accordingly, to avoid paying greater damages and facing personal-liability exposure under § 1983, local governments and their officials have a strong incentive to proceed by eminent domain or by agreement with the property owner rather than by attempting to deprive owners of their property without due process of law or by simply taking it via oppressive regulation without just compensation. If the measure of damages for these types of wrongful regulatory takings and deprivations were the same as those available in eminent-domain proceedings, governmental actors would have little or no incentive to proceed lawfully.

## V

### The Ripeness of Plaintiffs' Substantive Due Process Claims Under § 1983

In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the United States Supreme Court held that a property owner's federal takings and substantive due process damage claims were premature because the property owner "ha[d] not yet obtained a final decision regarding how it will be allowed to develop its property," and "did not seek compensation through the procedures the State ha[d] provided for doing so." *Id.* at 190, 194, 105 S.Ct. at 3118, 3120, 87 L.Ed.2d at 141, 143.

Here it would appear to me that the first prong of *Williamson*'s ripeness doctrine has been satisfied. The town's decision not to allow plaintiffs to proceed with their proposed subdivision of their property was final. Although plaintiffs never sought a variance from the invalid two-acre zoning ordinance, no such application should be required when the ordinance itself is being facially challenged as invalid. *See Suitum v. Tahoe Regional Planning Agency*, — U.S. —, — n. 10, 117 S.Ct. 1659, 1666 n. 10, 137 L.Ed.2d 980, 991 n. 10 (1997) ("'facial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed"); *cf. Abbott Laboratories v. Gard-*

*ner*, 387 U.S. 136, 153, 87 S.Ct. 1507, 1518, 18 L.Ed.2d 681, 694 (1967) (FDA's labeling regulation held ripe for challenge from drug manufacturers despite lack of any attempt by FDA to enforce the regulation against the manufacturers because FDA's adoption of the regulation constituted a final agency decision and the regulation required "an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance"), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). However, for the reasons previously stated, plaintiffs have not even tried, much less exhausted, what I consider to be the adequate and available state-damage remedies for defendants' misconduct. Nonetheless, I do not believe the second exhaustion-of-state-remedies prong of *Williamson*'s ripeness doctrine applies to substantive due process claims like these.

The applicability of *Williamson*'s exhaustion of state-compensation-remedies requirement to substantive due process claims has resulted in a split among the federal circuit courts. *Compare Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215 (6th Cir.1992) (substantive due process claim arising from a zoning-change denial is ripe for judicial review without a variance application) *with Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506, 516 (1st Cir.1987) ("there can be no violation of substantive due process * * * at least until the state inverse condemnation proceeding is resolved"). But there should be no exhaustion requirement for substantive due process claims like those here because, unlike takings claims, the due process clause does not require a denial of just compensation before a property deprivation is actionable. In a property regulation context, substantive due process is concerned with the rationality of the state's regulation and the nonarbitrariness of its selected means for doing so. Thus, proving whether a state provides an adequate remedy for the property owner to be compensated for such violations is not a condition precedent to stating a substantive due process claim. Indeed, even if the state adequately compen-

sates property owners for substantive due process violations, the challenged deprivation should not be allowed to stand if it is arbitrary, capricious, or devoid of any rational governmental purpose. Thus such substantive due process claims should be actionable in either state or federal court without first exhausting whatever otherwise adequate compensation remedies may be available under state law.

Moreover, the existence of constitutional and common-law remedies under state law is generally no bar to a § 1983 claim because such actions "exist independent of any other legal or administrative relief that may be available as a matter of federal or state law. They are judicially enforceable *in the first instance.*" *Felder v. Casey,* 487 U.S. 131, 148, 108 S.Ct. 2302, 2312, 101 L.Ed.2d 123, 144 (1988) (quoting *Burnett v. Grattan,* 468 U.S. 42, 50, 104 S.Ct. 2924, 2929, 82 L.Ed.2d 36, 44 (1984)). Indeed, any state law rules or practices that may inhibit the prosecution of § 1983 actions in state courts are preempted by the Supremacy Clause of the United States Constitution. *Id.* at 138, 153, 108 S.Ct. at 2306–07, 2314, 101 L.Ed.2d at 137–38, 147; *see also Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492, 503 (1961) ("[t]he federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked"), *overruled on other grounds by Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Willbourn v. City of Tulsa,* 721 P.2d 803, 805 (Okla.1986) ("the remedy provided by § 1983 must be independently enforceable even if a parallel state remedy is available"). As one commentator has noted:

"[T]he denial of access to state courts because of the existence of state remedies is inconsistent with the supplementary nature of the § 1983 remedy. Thus, when plaintiffs raise claims under § 1983 because of the superior federal remedial policies, including the availability of attorney fees, the disagreement of state courts with the federal policies is not a valid excuse for rejecting plaintiffs' federally created ac-

tions or refusing to apply the remedial attributes of § 1983." 1 Steven H. Steinglass, *Section 1983 Litigation in State Courts* § 10.4 at 10–13 (1996).

Thus, in *Zinermon v. Burch,* 494 U.S. 113, 124, 110 S.Ct. 975, 982, 108 L.Ed.2d 100, 113 (1990), the United States Supreme Court held that "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." The Court in *Zinermon* distinguished between § 1983 claims based on violations of substantive due process and those claims based on procedural due process, noting that only when a § 1983 claim raises procedural due process issues is the existence of an available state or common law remedy even relevant. *Id.* at 125–26, 110 S.Ct. at 983, 108 L.Ed.2d at 113–14. Quoting *Monroe,* 365 U.S. at 183, 81 S.Ct. at 482, 5 L.Ed.2d at 503, the *Zinermon* Court stated:

"It is no answer that the State has a law which if enforced would give relief. *The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.*" 494 U.S. at 124, 110 S.Ct. at 982, 108 L.Ed.2d at 113. (Emphasis added.)

Indeed, in *Howlett v. Rose,* 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990), the United States Supreme Court held that in § 1983 cases state courts are *obliged* to enforce § 1983 claims "according to their regular modes of procedure":

"Federal law is enforceable in state courts not because Congress has determined that federal courts would otherwise be burdened or that state courts might provide a more convenient forum * * * but because the Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislature. The Supremacy Clause makes those laws 'the supreme Law of the Land,' and charges state courts with a coordinate responsibility to enforce that law according to their regular modes of procedure." 496 U.S. at 367, 110 S.Ct. at 2438, 110 L.Ed.2d at 347.

Accordingly I concur in the court's decision to reach the merits of plaintiffs' due process claims notwithstanding their failure to invoke or to pursue adequate and available state remedies.

## VI

### The Damages Award to L.A. Ray Realty

The majority of the court affirms the trial justice's refusal to award lost-profits damages for the proposed subdivision and sale of lots in sections 3 and 4 of L.A. Ray Realty's property. Because plans for these areas were not yet at the final approval stage, the trial justice believed that the town's planning authorities could have rejected these development plans for any number of legitimate reasons.

However, the trial justice found that the plans were rejected for illegitimate and arbitrary reasons, thereby violating this plaintiff's right to substantive due process and depriving it of its right to use its property for any lawful purpose. Such conduct also amounts to a taking of property because it fails to "substantially advance[ ] legitimate state interests." *Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147, 97 L.Ed.2d at 687 (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980)); *see also Alegria v. Keeney,* 687 A.2d 1249, 1252 (R.I.1997). The fact that the town might have been able to reject final plans on sections 3 and 4 for some unknown but legitimate reason or reasons seems to me to be irrelevant. It did not in fact do so. Nor is it reasonable to assume that this plaintiff would have been unable to satisfy any legitimate objections that may have been raised to its proposed subdivision of sections 3 and 4. Indeed, under *Dolan v. City of Tigard,* 512 U.S. 374, 386–91, 114 S.Ct. 2309, 2317–20, 129 L.Ed.2d 304, 318–21 (1994), the burden of proof would be on the town to establish not only the existence of an "essential nexus" between the asserted legitimate governmental interests and the permitting conditions in question, but also a "rough proportionality" between any subdivision or development conditions it may seek to impose and the projected impact of the proposed subdivision/development on the municipality.

Moreover, I believe that plaintiff had already taken sufficient steps in reliance on the pre–1987 zoning scheme to allow it to proceed with the proposed subdivision of sections 3 and 4 of their property. *See Tantimonaco v. Zoning Board of Review of Johnston,* 102 R.I. 594, 602, 232 A.2d 385, 389 (1967) (" 'rights existing under an ordinance may not be swept aside by a subsequently enacted zoning ordinance, where, in reliance on the existing ordinance, expenses are incurred in preparing for the issuance of a permit' "); *see also DeFalco v. Voccola,* 557 A.2d 474, 476 (R.I.1989) ("[w]e have recognized the doctrine of equitable estoppel in zoning contexts"); *Jones v. Rommell,* 521 A.2d 543, 545 (R.I.1987) ("equity immunizes a building permit from cancellation when the property owner incurs substantial obligations in good-faith reliance on the issuance of the permit"); *Shalvey v. Zoning Board of Review of Warwick,* 99 R.I. 692, 210 A.2d 589 (1965). When the town unlawfully prevented plaintiff from proceeding with its planned subdivision of phases 3 and 4, it should be held liable for the plaintiff's lost-profits damages proximately caused by the town's misconduct.

### Conclusion

For these reasons, I concur in all aspects of the majority's opinion except as indicated above. But I dissent from its decision not to award damages to L.A. Ray Realty for the town's refusal to allow it to subdivide and sell sections 3 and 4 of its proposed development.