USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1199

 PHILIP MORRIS, INCORPORATED, ET AL.,
 Plaintiffs, Appellees,

 v.

 SCOTT HARSHBARGER, ATTORNEY GENERAL OF MASSACHUSETTS, ET AL.,
 Defendants, Appellants.

 ____________________

No. 98-1200

 UNITED STATES TOBACCO COMPANY, ET AL.,
 Plaintiffs, Appellees,

 v.

 L. SCOTT HARSHBARGER, ATTORNEY GENERAL OF MASSACHUSETTS, ET AL.,
 Defendants, Appellants.

 APPEALS FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. George A. O'Toole, Jr., U.S. District Judge]

 Before

 Selya, Circuit Judge,
 Wellford,* Senior Circuit Judge,
 and Lipez, Circuit Judge.
 

_______________
*Of the Sixth Circuit, sitting by designation.

 William W. Porter, Assistant Attorney General, with whom Scott
Harshbarger, Attorney General, and Thomas A. Barnico, Assistant
Attorney General, were on brief, for appellants.
 Henry C. Dinger, with whom Henry C. Dinger, P.C., Thomas J.
Griffin, Jr., Cerise Lim-Epstein, Goodwin, Procter & Hoar, LLP,
Verne W. Vance, Jr., John H. Henn, Foley, Hoag & Eliot LLP, Donald
J. Wood, Connarton, Wood & Callahan, Richard M. Zielinski, Hill &
Barlow, Herbert Dym, Clausen Ely, Jr., Patricia A. Barald, David H.
Remes, and Covington & Burling were on brief, for appellees in No.
98-1199.
 George J. Skelly, with whom Thomas J. Dougherty, Skadden,
Arps, Slate, Meagher & Flom LLP, A. Hugh Scott, Robert A. Kole,
Choate, Hall & Stewart, John L. Oberdorfer, G. Kendrick Macdowell,
and Patton Boggs, L.L.P. were on brief, for appellees in No. 98-
1200.

November 6, 1998

 SELYA, Circuit Judge. The plaintiffs in this case,
manufacturers of cigarettes and smokeless tobacco products,
mounted a constitutional challenge to the novel ingredient-
reporting requirements of Mass. Gen. L. ch. 94, 307B (Section
307B). The district court granted the plaintiffs' motion for a
preliminary injunction restraining two state officials
(collectively, the Commonwealth) from enforcing these requirements. 
In this venue, the Commonwealth invites us to vacate or modify the
injunction. We decline the invitation.
 I.
 Background
 A.
 The Statute
 Regulation is not a stranger to the tobacco industry. 
The Federal Cigarette Labeling and Advertising Act, 15 U.S.C. 
1335a (1994) (the Labeling Act), mandates that "[e]ach person who
manufactures, packages, or imports cigarettes shall annually
provide the Secretary [of Health and Human Services] with a list of
the ingredients added to tobacco in the manufacture of cigarettes,"
but this list need not "identify the company which uses the
ingredients or the brand of cigarettes which contain the
ingredients," and those required to furnish lists may designate
proxies to do so on their behalf. Cigarette manufacturers
typically comply with the Labeling Act's strictures through an
internuncio; they submit information to a law firm which acts as a
clearinghouse for the industry. The law firm then furnishes an
annual list of all ingredients used by any of the companies to the
Secretary. The law firm maintains the secrecy of the ingredients
used in a particular brand from both the government and the brand's
competitors. In short, though the Labeling Act obligates the
Secretary to report to Congress health risks from tobacco products
discerned directly or indirectly through the lists, it assures
confidentiality for trade secrets.
 Existing state law is not much more intrusive. Apart
from Massachusetts, only Minnesota and Texas have required any
reporting of tobacco ingredients. The Minnesota statute, Minn.
Stat. 461.17 (Supp. 1997), compels tobacco manufacturers to
report the use of any of several targeted additives in their
products. The Texas law, Tex. Health & Safety Code Ann., 
161.251-255 (West Supp. 1998), bears certain similarities to
Section 307B, but provides protection for information submitted
that "would be excepted from public disclosure as a trade secret
under state or federal law." Id. 161.254(c).
 Massachusetts has gone further. When Section 307B was
enacted as a means of regulating the tobacco industry, proponents
billed it as an innovative regulatory effort which, incidentally,
would protect public health. See Press Release Distributed by the
Commonwealth upon Signing of Section 307B, August 2, 1996 (quoting
then-Governor William F. Weld's description of Section 307B as "a
common sense, pro-consumer bill that will give people all the
information they need to make educated decisions about what they
put in their bodies"). The statute significantly expands the reach
of existing positive law. Its ingredient-reporting provisions are
novel both because they demand brand-by-brand reporting of
additives and because they permit public disclosure of this
ingredient information.
 Specifically, Section 307B stipulates that each
manufacturer of tobacco products must report annually to the
Massachusetts Department of Public Health (DPH) "[t]he identity of
any added constituent other than tobacco, water or reconstituted
tobacco sheet made wholly from tobacco, to be listed in descending
order according to weight, measure, or numerical count" for each
brand sold within the state. Any such information that DPH
reasonably concludes "could reduce risks to public health, shall be
public records," as long as the attorney general advises DPH that
such disclosure would not work an unconstitutional taking. The
historical archives clearly indicate the legislature's intent. For
instance, in a letter urging colleagues to support the bill that
eventually became Section 307B, a proponent explained that brand-
specific reporting and disclosure are necessary because "[i]f you
smoke Merits you want to know what is in Merits, not what may be in
every brand of cigarettes on the market." Letter from Senator
Warren E. Tolman to Colleagues 2 (June 14, 1996).
 B.
 The Marlboro Man's Secret
 Because consumers choose brands based on flavor, taste,
and aroma, and tend to remain loyal to those brands, small fortunes
are spent creating the flavor formulas for tobacco products. The
information needed to copy these formulas is, in turn, worth many
millions of dollars. See, e.g., Kurt Badenausen, Blind Faith,
Financial World, July 8, 1998, at 50-65 (describing Philip Morris's
Marlboro brand as worth over $44,000,000 and rating it the most
valuable of 364 brand names surveyed). It is no secret that
tobacco companies, like other manufacturers of brand name products,
employ elaborate procedures to safeguard their ingredient
information. For example, suppliers sign confidentiality
agreements and furnish their wares in coded packaging, devoid of
proprietary names, to keep ingredient information under wraps. 
Even in house, copies of flavor formulas are retained under lock
and key, and ingredient information is made available only on a
"need to know" basis.
 The tobacco companies claim that the operation of Section
307B threatens to destroy these enormously valuable trade secrets. 
The industry submits aggregate lists of all ingredients included in
tobacco products sold in the United States in compliance with
federal law. However, at the current state of technology, these
lists cannot feasibly be used to copy a tobacco product's taste or
aroma. Divulging brand-specific lists of ingredients in descending
order of volume, as required by Section 307B, is quite a different
story; the plaintiffs aver and the Commonwealth, for purposes of
this proceeding, does not contradict that such lists, when and as
disclosed, will allow pirates to "reverse engineer" products
possessing flavors and aromas indistinguishable from popular
brands, with substantially reduced research and development costs. 
The threat of this increased ease of entry into, and competition
within, the tobacco industry fuels the plaintiffs' challenge to
Section 307B.

 C.
 Proceedings Below
 The cigarette and smokeless tobacco companies brought
separate suits attacking Section 307B. Their complaints claimed
that the statute was preempted by federal law and that it ran afoul
of various constitutional impediments, including the Takings
Clause, the Commerce Clause, and the Due Process Clause. The
district court consolidated the cases. Early on, it resolved the
preemption question in favor of the Commonwealth, and we affirmed
that determination. See Philip Morris, Inc. v. Harshbarger, 122
F.3d 58, 87 (1st Cir. 1997).
 The plaintiffs had greater success when they moved for a
preliminary injunction to prevent the enforcement of Section 307B's
ingredient-reporting requirements. Finding that the plaintiffs
were likely to succeed on the merits of their takings claim and
that they faced irreparable harm in the absence of interim relief,
the district court restrained the enforcement of the ingredient-
reporting provisions pendente lite. This interlocutory appeal
ensued. We have jurisdiction under 28 U.S.C. 1292(a)(1).

 II.
 Analysis
 A.
 The Preliminary Injunction Standard
 In considering a request for a preliminary injunction, a
trial court must weigh several factors: (1) the likelihood of
success on the merits, (2) the potential for irreparable harm to
the movant, (3) the balance of the movant's hardship if relief is
denied versus the nonmovant's hardship if relief is granted, and
(4) the effect of the decision on the public interest. See Ross-
Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st
Cir. 1996); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5
(1st Cir. 1991). Likelihood of success is the touchstone of the
preliminary injunction inquiry. See Ross-Simons, 102 F.3d at 16;
Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). Mindful of
this reality, the Commonwealth confines its challenge here to this
element.
 We review the trial court's grant or denial of a
preliminary injunction only for abuse of discretion or mistake of
law. See EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir.
1996). This standard requires "a party who appeals from the
issuance of a preliminary injunction [to] bear[] the considerable
burden of demonstrating that the trial court mishandled the four-
part framework." Ross-Simons, 102 F.3d at 16. Our analysis
proceeds accordingly.
 B.
 Takings Analysis: An Overview
 The Takings Clause of the Fifth Amendment is incorporated
in, and applies to the states by virtue of, the Fourteenth
Amendment. See Chicago, Burlington & Quincy R.R. Co. v. Chicago,
166 U.S. 226, 239 (1897); Culebras Enters. Corp. v. Rivera Rios,
813 F.2d 506, 515 (1st Cir. 1987). Case law under the Takings
Clause has developed along two parallel lines, one addressing
physical invasions (sometimes called per se takings) and the other
addressing regulatory takings. See Lucas v. South Carolina Coastal
Comm'n, 505 U.S. 1003, 1015 (1992). Here, the plaintiffs'
principal claim is that Section 307B works a regulatory taking. 
The thrust of their argument is that the Commonwealth's action in
requiring disclosure and permitting the subsequent publication of
brand-specific ingredient information is not everyday regulation,
the inconveniences of which individuals in a civilized society must
bear, but, rather, goes so far that it impermissibly takes their
property for public use without just compensation, in violation of
the Takings Clause. See Pennsylvania Coal Co. v. Mahon, 260 U.S.
393, 415 (1922).
 To evaluate the propriety of a preliminary injunction on
a regulatory takings claim, an inquiring court must sort through a
takings analysis in addition to the multi-factored preliminary
injunction determination. This takings analysis should include
consideration of "the character of the governmental action, its
economic impact, and its interference with reasonable, investment-
backed expectations." PruneYard Shopping Ctr. v. Robins, 447 U.S.
74, 83 (1980). Although the articulation of these factors makes
the takings inquiry seem much like any other multi-pronged test,
the Supreme Court has stated in no uncertain terms that a
regulatory takings analysis should not be governed by a "set
formula," but must be determined by an "essentially ad hoc, factual
inquir[y]." Penn Cent. Transp. Co. v. New York City, 438 U.S. 104,
124 (1978). Thus, the three elements enumerated in PruneYardoperate primarily as lenses through which a court can view and
process the facts of a given case rather than as a checklist of
items that can be ticked off as fulfilled or unfulfilled.
 In the case at hand, the lower court determined that the
plaintiffs enjoyed a likelihood of success on their regulatory
takings claim. The Commonwealth disputes this determination on two
main grounds. First, it faults the lower court's conclusion that
the plaintiffs' reasonable, investment-backed expectations of
nondisclosure of ingredient information sufficed to legitimate the
finding of a taking. Second, it challenges the court's
characterization of the governmental action, asseverating that the
application of Section 307B's ingredient-reporting provisions to
the plaintiffs lacks legal compulsion sufficient to create an
actionable taking. After a brief detour, we will consider these
contentions sequentially.
 Before proceeding to address the Commonwealth's claims,
we think it is useful to clarify what the Commonwealth does notclaim in this proceeding. For one thing, it does not now dispute
that information provided to DPH under Section 307B will be
disclosed to the public. For another thing, it concedes for
purposes of these appeals that such information will include
valuable trade secrets, susceptible to destruction if exposed. 
Finally, because the statute was enacted as a regulatory measure,
it is perforce grounded in the state's police power over matters of
public health. Although the Commonwealth suggests with scant
elaboration that the police power alone offers a sufficient
justification for the statute, the parties primarily have briefed
and argued the issue of whether the Takings Clause may invalidate
the statute. We have therefore focused our likelihood of success
analysis on this Takings Clause issue. At this stage of the
proceedings, the Commonwealth has not developed any independent
"police power" rationale to justify its position and, accordingly,
we have before us insufficient "police power" rationale to reach a
decision on that issue.
 C.
 The Plaintiffs' Expectations
 In debating whether the plaintiffs possess the requisite
expectations to support a takings claim, both sides embrace the
Supreme Court's decision in Ruckelshaus v. Monsanto Co., 467 U.S.
986 (1984). Monsanto is a complex case based on intricate facts
and it ultimately propounds several holdings. Despite the palpable
difficulty of doing so, we believe it is necessary to explicate the
factual scenario that confronted the Monsanto Court in order to
assess the conflicting claims asserted here.
 Monsanto involved sequential amendments to the Federal
Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. 136
et seq., the first set of amendments occurring in 1972 and the
second set in 1978. See Monsanto, 467 U.S. at 990-97. The timing
of these amendments created three distinct FIFRA regimes. From
1947 (when Congress first enacted FIFRA) until the effective date
of the 1972 amendments, FIFRA operated primarily as a licensing and
labeling statute; its terms required all pesticides sold in
interstate or foreign commerce for use within the United States to
be registered with the Secretary of Agriculture and appropriately
labeled. See id. at 991. In addition, FIFRA empowered the
Secretary to require applicants for registration to produce testing
data (including pesticide formulas) and to substantiate claims
asserted on product labels. See id. The statute forbade the
Secretary to disclose formula information, but made no mention of
what protection, if any, attended the submission of other testing
data. See id.
 In 1970, Congress shifted the responsibility for
administering FIFRA from the Department of Agriculture to the
Environmental Protection Agency (EPA). See Reorganization Plan No.
3 of 1970, 3 C.F.R. 1074 (1966-1970), reprinted in 5 U.S.C. app. at
1552 (1994). Shortly thereafter, the 1972 amendments metamorphosed
FIFRA into a comprehensive regulatory scheme for pesticides. This
scheme, in effect from 1972 to 1978, required disclosure to the EPA
and the public of environmental, health, and safety data but it
provided specific protections for that data so as to avoid the
revelation of trade secrets. See Monsanto, 467 U.S. at 992. 
During this period, FIFRA allowed applicants to designate submitted
information as "trade secrets or commercial or financial
information," and simultaneously prohibited the EPA from publishing
such information. Id. (quoting applicable statutory provision). 
If the EPA and an applicant disagreed as to the status of submitted
information and the EPA proposed to make such information public,
FIFRA authorized the applicant to bring a declaratory judgment
action in a federal district court prior to publication. See id. 
The 1972 amendments also allowed the EPA to use information
provided by one applicant in its consideration of another
applicant's request for registration of a similar chemical,
provided that the latter agreed to compensate the former. See id. 
It must be noted, however, that this information-sharing
requirement only applied to data designated as "trade secrets or
commercial or financial information" if the initial applicant
consented to such use. Id.
 When Congress amended FIFRA again in 1978, it altered the
safeguards against disclosure with respect not only to data
thereafter submitted, but also with respect to data that had been
supplied during earlier periods. See id. at 994-95. Under the
1978 iteration of the statutory scheme, applicants who submitted
health, safety, or environmental information to EPA for pesticides
registered after September 30, 1978, received a ten-year period of
exclusive use for any such data that related to new active
ingredients. See id. at 994. Any other data that had been
tendered after December 31, 1969 were to be made available for
citation and consideration in support of other applications for
fifteen years after the original submission date, provided that the
later applicant agreed to compensate the original submitter. Seeid. The 1978 amendments also allowed all health, safety, and
environmental data to be divulged upon request, notwithstanding the
prohibition on disclosing trade secrets, but did not authorize
revelation of manufacturing or quality control processes without a
determination by the EPA that such disclosure was "necessary to
protect against an unreasonable risk of injury to health or the
environment." Id. at 995-96 (quoting applicable statutory
provision).
 The Monsanto plaintiff, a pesticide manufacturer, argued
that use or disclosure of the trade secrets that it had submitted
to the federal sovereign during any of the three periods would
constitute a regulatory taking. The Court decided as a threshold
matter that the data constituted "property" under state law and
thus enjoyed protection under the Takings Clause. See id. at 1003-
04. The Court then addressed each of the three statutory
intervals. Apropos of the 1972-78 period, the Court held that
uncompensated (or undercompensated) use or disclosure of trade
secret data submitted during that time frame would constitute a
taking. See id. at 1010-14. In contrast, the Court ruled that
there could be no taking for either the pre-1972 or the post-1978
periods because the pesticide manufacturer had no reasonable,
investment-backed expectation of governmental nondisclosure during
those periods. See id. at 1006-07, 1009-10. Speaking of this last
period, the Court explained: "[A]s long as [a pesticide
manufacturer] is aware of the conditions under which the data are
submitted, and the conditions are rationally related to a
legitimate government interest, a voluntary submission of data by
an applicant in exchange for the economic advantages of
registration can hardly be called a taking." Id. at 1007.
 The Commonwealth uses the statement we have just quoted
to support its claim that, after the effective date of Section
307B, divulgement of submitted ingredient lists cannot work a
taking because the statute's enactment vitiates any reasonable
investment-backed expectation of nondisclosure on the tobacco
companies' part. We think that it is unfair to read Monsanto for
this proposition because the part of the Court's trifurcated
holding to which the Commonwealth clings depended on the existence
of a voluntary exchange. See Nollan v. California Coastal Comm'n,
483 U.S. 825, 833-34 n.2 (1987) (drawing this distinction). Under
the post-1978 FIFRA scheme, submitters of environmental, health,
and safety data received significant benefits in return for the
disclosure of their data, including rights of exclusive use for a
term of years and rights to compensation from later applicants who
wished to utilize submitted data. Since this exchange afforded
tangible compensation to pesticide manufacturers, the post-1978
version of FIFRA did not work an uncompensated taking (and, hence,
did not work an unconstitutional taking). Section 307B effects no
comparable bargain.
 The Commonwealth demurs. The exchange, it says, consists
of permitting the tobacco companies to continue doing business in
Massachusetts in return for the companies' compliance with Section
307B. This construct will not wash. A Monsanto-type exchange
requires that the government grant a benefit of real value to
compensate a property owner for a taking. In constructing this
balance, not all benefits bestowed by the sovereign will possess
sufficient substance to ameliorate the taking and the state's
self-interested characterization of a right as a benefit cannot
change the underlying calculus. Permitting a company to continue
conducting business within a state, while a benefit of sorts, lacks
sufficient substance to create a Monsanto-type exchange.
 Nollan illustrates this point. There, a governmental
entity required a landowner to dedicate a public easement across
his beachfront property in order to obtain a building permit to
improve the existing structure. See id. at 828. To counter the
landowner's assertion that the compelled easement comprised a
taking, the dissent called the permit a benefit and claimed that
its conferral triggered an exchange akin to that in Monsanto. Seeid. at 860 n.10 (Brennan, J., dissenting). The majority disagreed,
stating that "the announcement that the application for (or
granting of) the permit w[ould] entail the yielding of a property
interest cannot be regarded as establishing the voluntary
'exchange' that we found to have occurred in Monsanto." Nollan,
483 U.S. at 834 n.2 (citations omitted). The Nollan Court
explained that the ability to improve one's own property, though
subject to some regulation, is incomparable to the type of
government benefit proffered in exchange for use and disclosure of
trade secret information in Monsanto. See id. Thus, Nollanteaches that the mere granting of permission to engage in routine
activities, incident to existing property rights, does not afford
compensation sufficient to support a Monsanto-type exchange.
 Applying Nollan's rationale here, it is pellucid that the
Commonwealth's unilateral announcement that the privilege of
continuing to do business in Massachusetts henceforth will entail
the yielding of a tobacco company's trade secrets cannot, in
itself, establish a benefit sufficient to support a voluntary
exchange within the Monsanto paradigm. The ability to conduct
(and, more especially, to continue to conduct) a lawful business in
Massachusetts, though subject to some governmental requirements,
simply is not analogous, either in kind or in degree, to the
benefit that effected the exchange and extinguished the takings
claim in Monsanto. In context, then, the Monsanto Court's
discussion of FIFRA's post-1978 regime offers the Commonwealth cold
comfort.
 The Commonwealth finds somewhat sturdier support for its
position in the Monsanto Court's resolution of the takings issue
for the pre-1972 period. Even though the earliest versions of
FIFRA included no conditions explicitly permitting public
disclosure of submitted data, and the Trade Secrets Act, 18 U.S.C.
 1905, effectively barred disclosure of trade secrets by
government agencies and employees, the Court held that when
Monsanto submitted data during the pre-1972 period it "could not
have had a 'reasonable investment-backed expectation' that EPA
would maintain those data in strictest confidence and would use
them exclusively for the purpose of considering the Monsanto
application in connection with which the data were submitted." 
Monsanto, 467 U.S. at 1010. Consequently, the Court found no
unconstitutional taking for that period.
 The analogy between Monsanto's pre-1972 period and
Section 307B cannot be brushed aside lightly. Historically,
Massachusetts has granted protection to trade secrets both
statutorily, see Mass. Gen. Laws, ch. 93 42, 42A (1997), and
under state common law, see, e.g., Peggy Lawton Kitchens, Inc. v.
Hogan, 466 N.E.2d 138, 139-40 (Mass. App. Ct. 1984). The
Commonwealth makes a plausible argument that these protections
together comprise a general, external source of protection
comparable to the Trade Secrets Act. Under the Monsanto Court's
reasoning regarding submissions during the pre-1972 period, this
argument holds, the tobacco companies would have no founded
expectation of nondisclosure in respect to information submitted
pursuant to the strictures of Section 307B. In the last analysis,
however, Monsanto itself neutralizes this argument.
 The Monsanto Court's holding that no uncompensated taking
occurred during the pre-1972 and post-1978 periods is neither the
be-all nor the end-all of its opinion. The Justices also held that
Monsanto had reasonable, investment-backed expectations sufficient
to support a regulatory takings claim for data submitted during the
intermediate 1972-78 period. See Monsanto, 467 U.S. at 1011. This
undermines the Commonwealth's argument because the 1972-78 period
presents the closest, most persuasive analogy to the situation
created by Section 307B. The FIFRA scheme then in effect provided
specific protections for trade secret information and the Court
determined that pesticide registrants might reasonably rely on
these protections. See id. at 1010-11. The statutory and common 
law protections for trade secret information in place in the
Commonwealth create a very similar prophylaxis and thus form the
basis for a reasonable expectation of continued confidentiality.
 Because this matter is before us on appeal from the grant
of a preliminary injunction, we need not rule definitively on the
point. Likelihood-of-success determinations in such a context
require only that courts formulate statements of probable outcomes. 
See Cohen v. Brown Univ., 991 F.2d 888, 902 (1st Cir. 1993);
Narragansett Indian Tribe, 934 F.2d at 6. While we cannot entirely
dismiss the Commonwealth's argument, we are comfortable in
concluding that it probably will bear no fruit.
 This is especially so because other signposts point in a
direction favoring the tobacco companies' position. Most notably,
recent Supreme Court cases share a greater affinity with the NollanCourt's distinction of Monsanto a distinction that did not
explicitly differentiate among the case's three holdings than
with the Commonwealth's isthmian focus on Monsanto's treatment of
the pre-1972 period. See, e.g., Dolan v. City of Tigard, 512 U.S.
374, 391 (1994) (holding that burdens of municipal exactions
required in exchange for building permits must achieve a "rough
proportionality" with benefits received by the landowner to avoid
municipal liability for a taking); Lucas, 505 U.S. at 1031-32
(requiring South Carolina to prove that a landowner's intended
residential use of his land would create a common law nuisance in
order to avoid a finding of a taking without just compensation). 
These authorities show the Court's increasing concerns in this area
and counsel persuasively that the Court will demand substantial,
rather than nominal, compensation to legitimize governmental
takings. In light of this guidance, we cannot accept the
Commonwealth's claim that mere leave to continue one's business
activities in a state will duly compensate a taking of valuable
private property rights.
 D.
 Legal Compulsion 
 The Commonwealth's remaining theory posits that Section
307B cannot work a taking as a matter of law because it lacks
"legal compulsion" in other words, the law works no taking
because it does not force the tobacco companies to sell their
products in Massachusetts (and, thus, they can avoid any need to
grapple with it merely by limiting their business activities to
more hospitable climes). In pressing this theory, the Commonwealth
relies chiefly upon Hinesburg Sand & Gravel Co. v. Crittenden Solid
Waste Dist., 959 F. Supp. 652 (D. Vt. 1997). In that case, a
landowner sued a municipal authority to recover legal costs
incurred in defending against the attempted condemnation of his
property, alleging that there had been a taking. See id. at 656-
57. The court ruled that no taking had occurred because the
landowner was not legally compelled to spend funds defending his
property. See id. at 657-58.
 Hinesburg is small solace to the Commonwealth. The
court's legal reasoning is suspect and, in all events, the case is
plainly inapposite. Here, unlike in Hinesburg, a state statute
forces a party to make a Hobson's choice: either submit ingredient
lists containing valuable trade secrets without adequate safeguards
or cease doing business in an important market. This is the
essence of legal compulsion.
 The other authorities cited by the Commonwealth are no
more convincing. See, e.g., Bowles v. Willingham, 321 U.S. 503,
517 (1944) (holding that wartime rent control did not work a taking
and noting that "[t]here is no requirement that the apartments in
question be used for purposes which bring them under the Act");
Meriden Trust & Safe Deposit Co. v. FDIC, 62 F.3d 449, 455 (2d Cir.
1995) (concluding that FDIC cross-guarantee provisions did not
unconstitutionally take private property because they presented
financial institutions with a choice between insuring and not
insuring); Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir. 1993)
(rejecting an anaesthesiologist's claim that Medicare fee-for-
service regulations constituted a taking and noting that doctors
are "under no legal duty to provide services to the public and to
submit to price regulations"). Underlying these cases, and others
like them, is the reality that a governmental entity which creates
a market's supply or sets its prices may be expected to alter
property rights in the course of modifying its regulations. Thus,
when an individual voluntarily participates in such a price-
regulated program or market, the Takings Clause does not protect
him from changes in his property rights due to changes in
applicable regulations.
 The situation created by Section 307B is entirely
different. The plaintiffs historically have participated in a
lawful, non-price-regulated market, in which state government
hitherto has not been directly involved. They now face the
potential loss of their valuable trade secrets merely to remain in
business in Massachusetts. The Commonwealth cannot by some
mysterious alchemy transform this situation into one akin to that
which existed in the regulated-market cases. Were the law
otherwise, any government entity could avoid the due operation of
the Takings Clause by the simple expedient of stating its
intentions in advance.
 The Commonwealth derives its final support for its "legal
compulsion" argument from a footnote to the Monsanto Court's
discussion of why use and disclosure of data submitted after 1978
would not constitute a taking. In this note, the Justices
explained that a pesticide manufacturer could choose to forgo
registration in the United States and sell its pesticides solely in
foreign markets. See Monsanto, 467 U.S. at 1007 n.11 (dictum). 
Using footnote 11 as a springboard, the Commonwealth maintains that
the tobacco companies suffer no taking under Section 307B because
they may refrain from selling their products in Massachusetts and
thereby thwart disclosure.
 This argument wrenches footnote 11 loose from its
contextual moorings. The Supreme Court appended the footnote to
its discussion of the voluntary exchange component of Monsanto's
post-1978 regime. Voluntary exchange is a far cry from the
situation at hand, in which the only benefit offered by the
government in return for releasing the tobacco companies' trade
secrets is the right to continue doing business in the
Commonwealth. As we already have explained, see supra at 17-18,
permission to continue operating a lawful business is not the type
of government benefit on which a Monsanto-type exchange validly may
be predicated.
 In sum, the fact that the tobacco companies may cease
doing business in Massachusetts if they do not wish to submit
ingredient information to the DPH is true as far as it goes, but,
as a principle of constitutional law, it does not go very far.
 E.
 The Scope of The Injunction
 At a last gasp, the Commonwealth insists that the lower
court swept too broadly in fashioning the preliminary injunction
and, therefore, abused its discretion. In the Commonwealth's view,
the district court could have met the plaintiffs' legitimate needs
by allowing the ingredient information to be furnished to DPH, as
required by Section 307B, and enjoining only public disclosure of
the data.
 We agree that, in the exercise of the district court's
discretion, a narrower order might have been appropriate. Still,
there is a rub: the Commonwealth never tendered this suggestion in
the district court. Having pursued the advantages of an all-or-
nothing strategy in arguing against the injunction, the
Commonwealth may not belatedly obtain the benefits of the more
moderate approach that, in the light of its defeat, now looks more
attractive.
 There is no reason to tarry. As a general rule, a
disappointed litigant cannot surface an objection to a preliminary
injunction for the first time in an appellate venue. See United
States v. Zenon, 711 F.2d 476, 478 (1st Cir. 1983) (explaining that 
parties are required to "state their objections to the injunction
to the district court, so that the district court can consider them
and correct the injunction if necessary, without the need for
appeal"). Having failed to comply with this basic rule, the
Commonwealth has forfeited the opportunity to obtain consideration
of whether the preliminary injunction, as framed, is overbroad.
 IV.
 Conclusion
 We need go no further. The short of it is that neither
the Commonwealth's "absence of reasonable, investment-backed
expectations" argument nor its "legal compulsion" construct
satisfies its weighty burden of demonstrating that the district
court committed a clear error of law or an abuse of discretion. 
The Commonwealth's effort to fault the breadth of the district
court's decree is similarly unavailing. Consequently, we are
unable to conclude, at the preliminary injunction stage, that the
district court erred in finding that the plaintiffs had
demonstrated a likelihood of success on the merits.

 Affirmed. Costs in favor of appellees.